# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE

FILED

**October 5, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

FOR PUBLICATION

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | **Filed:** October 5, 1998 |
| | ) | |
| Appellee, | ) | Knox County |
| | ) | |
| v. | ) | Hon. Mary Beth Leibowitz, |
| | ) | Judge |
| CHRISTA GAIL PIKE, | ) | |
| | ) | |
| Appellant, | ) | Supreme Court |
| | ) | No. 03S01-9712-CR-00147 |

FOR APPELLANT:

William C. Talman
Knoxville, Tennessee

Julie A. Martin
Knoxville, Tennessee

FOR APPELLEE:

John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

Kathy Morante
Deputy Attorney General
Nashville, Tennessee

Randall E. Nichols
District Attorney General
Sixth Judicial District
Knoxville, Tennessee

William H. Crabtree and
Sally J. Helm
Assistant District Attorneys General
Knoxville, Tennessee

# O P I N I O N

TRIAL COURT AND
COURT OF CRIMINAL APPEALS AFFIRMED.                    DROWOTA, J.

In this capital case, the defendant, Christa Gail Pike, was convicted of premeditated first degree murder and conspiracy to commit first degree murder. Following a sentencing hearing on the conviction for first degree murder, the jury found two aggravating circumstances: (1) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (2) "[t]he murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(i)(5) and (6) (1997 Repl.). Finding that the two aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death by electrocution. With respect to the defendant's conviction of conspiracy to commit first degree murder, the trial judge imposed a consecutive twenty-five-year sentence.

On direct appeal to the Court of Criminal Appeals, the defendant challenged both her convictions and sentences, raising eight claims of error. After fully considering the defendant's claims, the Court of Criminal Appeals affirmed the trial court's judgment. Thereafter, pursuant to Tenn. Code Ann. § 39-13-206(a)(1) (1997 Repl.),[1] the case was docketed in this Court.

The defendant raised numerous issues in this Court, but after carefully examining the entire record and the law, including the thorough opinion of the Court

---

[1]"Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the Court of Criminal Appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee Supreme Court. Upon the affirmance by the Court of Criminal Appeals, the clerk shall docket the case in the Supreme Court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure."

of Criminal Appeals and the briefs of the defendant and the State, this Court entered an Order on July 6, 1998, limiting review at oral argument to three issues. See Tenn. S. Ct. R. 12.[2] The case was heard at the September, 1998, term of this Court in Knoxville.

After reviewing the record, we have determined that none of the alleged errors have merit. Moreover, the evidence supports the jury's findings as to the aggravating and mitigating circumstances, and the sentence of death is not arbitrary or disproportionate to the sentence imposed in similar cases, considering the nature of the crime and the defendant. Accordingly, the judgment of the Court of Criminal Appeals upholding the defendant's convictions and sentences is affirmed.

## FACTUAL BACKGROUND

The proof presented by the State at the guilt phase of the trial established that on January 11, 1995, the defendant, Christa Gail Pike, a student at the Job Corps Center in Knoxville, told her friend Kim Iloilo, who was also a student at the facility, that she intended to kill another student, Colleen Slemmer, because she "had just felt mean that day." The next day, January 12, 1995, at approximately 8:00 p.m., Iloilo observed Pike, along with Slemmer, and two other Job Corps students, Shadolla Peterson and Tadaryl Shipp, Pike's boyfriend, walking away from the Job Corps

---

[2]Tennessee Supreme Court Rule 12 provides in pertinent part as follows: "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument."

center toward 17th Street. At approximately 10:15 p.m., Iloilo observed Pike, Peterson, and Shipp return to the Center. Slemmer was not with them.

Later that night, Pike went to Iloilo's room and told Iloilo that she had just killed Slemmer and that she had brought back a piece of the victim's skull as a souvenir. Pike showed Iloilo the piece of skull and told her that she had cut the victim's throat six times, beaten her, and thrown asphalt at the victim's head. Pike told Iloilo that the victim had begged "them" to stop cutting and beating her, but Pike did not stop because the victim continued to talk. Pike told Iloilo that she had thrown a large piece of asphalt at the victim's head, and when it broke into smaller pieces, she had thrown those at the victim as well. Pike told Iloilo that a meat cleaver had been used to cut the victim's back and a box cutter had been used to cut her throat. Finally, Pike said that a pentagram had been carved onto the victim's forehead and chest. Iloilo said that Pike was dancing in a circle, smiling, and singing "la, la, la" while she related these details about the murder. When Iloilo saw Pike at breakfast the next morning she asked Pike what she had done with the piece of the victim's skull. Pike replied that it was in her pocket and then said, "And, yes, I'm eating breakfast with it."

During a class later that morning, Pike made a similar statement to Stephanie Wilson, another Job Corps student. Pike pointed to brown spots on her shoes and said, "that ain't mud on my shoes, that's blood." Pike then pulled a napkin from her pocket and showed Wilson a piece of bone which Pike said was a piece of Slemmer's skull. Pike also told Wilson that she had slashed Slemmer's throat six times and had beaten Slemmer in the head with a rock. Pike told Wilson that the

victim's blood and brains had been pouring out and that she had picked up the piece of skull when she left the scene.

Though neither Iloilo nor Wilson immediately reported Pike's statements to police, on the day after the murder, January 13, at approximately 8:05 a.m., an employee of the University of Tennessee Grounds Department, discovered Slemmer's semi-nude, slashed, and badly beaten body near the greenhouses on the agricultural campus. He testified that the body was so badly beaten that he had first mistaken it for the corpse of an animal. Upon closer inspection, he saw the victim's clothes and her nude breast and realized it was the body of a human female. He immediately notified law enforcement officials.

Officers from the Knoxville Police Department and the U.T. Police Department were summoned to the scene. Officer John Terry Johnson testified at trial that the body he found was lying on debris and was nude from the waist up. Blood and dirt covered the body and remaining clothing. The victim's head had been bludgeoned. Multiple cuts and slashes appeared on her torso. Officer Johnson stated that he thought he was looking at the victim's face but he could not be sure because it was extremely mutilated. Johnson removed all civilians from the area and secured the scene surrounding the body.

As other officers arrived, they began securing the crime area. As officers discovered other areas of blood, articles of clothing, footprints, and broken foliage, the crime scene tripled in size, eventually encompassing an area 100 feet long by 60 feet wide. The crime scene was wet and muddy, and there was evidence of a scuffle,

with trampled bushes, hand and knee prints in the mud, and drag marks. A large pool of blood was found about 30 feet from the victim's body.

The victim's body was actually lying face down on a pile of debris. When officers turned the body over, they discovered that the victim's throat had been slashed. A bloody rag was around her neck. Detective Donald R. Cook, of the U.T. Police Department, accompanied the body to the morgue. He observed the body after it had been cleaned and noticed that a five pointed star in a circle, commonly known as a pentagram, had been carved onto the victim's chest.

Randy York, a criminal investigator with the Knoxville Police Department, began investigating this case on January 13, the day the victim's body was discovered. York separately interviewed the defendant and Shipp at the Knoxville Police Department on January 14th. Investigator York advised defendant Pike of her <u>Miranda</u> rights, but she chose to waive them and make a statement. Pike explained in detail how the killing had occurred. Pike's statement was tape-recorded and transcribed in some forty-six pages. Copies of the transcription were given to the jury, and the jurors were allowed to listen to the tape through individual headphones.

In her statement, Pike said that she and Slemmer had been having problems for some time. Pike claimed to have awakened one night to find Slemmer standing over her with a box cutter. Pike told Investigator York that Slemmer had been "trying to get [her] boyfriend" and had been "running her mouth" everywhere. Pike said that Slemmer had deliberately provoked her because Slemmer realized that Pike would

be terminated from the Job Corps program the next time she became involved in a fight or similar incident.

Pike claimed that she had not planned to kill Slemmer, but she had instead planned only to fight Slemmer and let her know "to leave me the hell alone." However, Pike admitted that she had taken a box cutter and a miniature meat cleaver with her when she and the victim left the Job Corps Center. Pike said she had borrowed the miniature meat cleaver, but refused to identify the person who had loaned it to her.

According to Pike, she asked Slemmer to accompany her to the Blockbuster Music Store, and as they were walking, Pike told Slemmer that she had a bag of "weed" hidden in Tyson Park. Though Pike refused to name the other parties involved in the incident, she said the group began walking toward the U.T. campus. Upon arriving at the steam plant on U.T.'s agricultural campus, Pike and Slemmer exchanged words. Pike then began hitting Slemmer and banging Slemmer's head on her knee. Pike threw Slemmer to the ground and kicked her repeatedly. According to Pike, as she slammed Slemmer's head against the concrete, Slemmer repeatedly asked, "Why are you doing this to me?" When Slemmer threatened to report Pike so she would be terminated from the Job Corps program, Pike again repeatedly kicked Slemmer in the face and side. Slemmer lay on the ground and cried for a time and then tried to run away, but another person with Pike caught Slemmer and pushed her to the ground.

Pike and the other person, who Pike referred to as "he," held Slemmer down until she stopped struggling, then dragged her to another area where Pike cut Slemmer's stomach with the box cutter. As Slemmer "screamed and screamed," Pike recounted how she began to hear voices telling her that she had to do something to prevent Slemmer from telling on her and sending her to prison for attempted murder.

At this point Pike said she was just looking at Slemmer and "just watching her bleed." When Slemmer rolled over, stood up and tried to run away again, Pike cut Slemmer's back, "the big long cut on her back." Pike said Slemmer repeatedly tried to get up and run. Pike recounted how Slemmer bargained for her life, begging Pike to talk to her and telling Pike that if she would just let her go, she would walk back to her home in Florida without returning to the Job Corps facility for her belongings. Pike told Slemmer to "shut up" because it "was harder to hurt somebody when they're talking to you." Pike said the more Slemmer talked, the more she kicked Slemmer in the face.

Slemmer asked Pike what she was going to do to her, at which point Pike thought she heard a noise. Pike left the scene to check out the surrounding area to make sure no one was around. When she returned, Pike began cutting Slemmer across the throat. When Slemmer continued to talk and beg for her life, Pike cut Slemmer's throat several other times. Pike said that Slemmer continued to talk and tried to sit up even though her throat had been cut several times, and that Pike and the other person would push her back on the ground.

Slemmer attempted to run away again, and Pike threw a rock which hit Slemmer in the back of the head. Pike stated that "the other person" also hit Slemmer in the head with a rock. When Slemmer fell to the ground, Pike continued to hit her. Eventually Pike said she could hear Slemmer "breathing blood in and out," and she could see Slemmer "jerking," but Pike "kept hitting her and hitting her and hitting her." Pike eventually asked Slemmer, "Colleen, do you know who's doing this to you?" Slemmer's only response was groaning noises. At this point, Pike said she and the other person each grabbed one of Slemmer's feet and dragged her to an area near some trees, leaving her body on a pile of dirt and debris. They left Slemmer's clothing in the surrounding bushes. Pike said the episode lasted "for about thirty minutes to an hour." Pike admitted that she and the other person had forced the victim to remove her blouse and bra during the incident to keep Slemmer from running away. Pike also admitted that she had removed a rag from her hair and tied it around Slemmer's mouth at one point to prevent Slemmer from talking. Pike denied carving a pentagram in the victim's chest, but said that the other person had cut the victim on her chest.

After disposing of Slemmer's body, Pike and the other person washed their hands and shoes in a mud puddle. They discarded the box cutter, and Pike returned the miniature meat cleaver to the person at Job Corps from whom she had borrowed it. Pike never identified that individual. Pike told Investigator York that the blood-stained jeans she had worn during the incident were still in her room. She said they were covered in mud because she had rubbed the mud from the bottom of her shoes onto the jeans to conceal the blood. Pike also admitted to Investigator York that she had discarded two forms of identification belonging to the victim and the victim's black

gloves in a trash can at a Texaco station on Cumberland Avenue. Pike gave Investigator York consent to search her room and then accompanied him to the Job Corps Center. From there Pike retraced her steps, describing what had occurred on the night of the killing. Investigator York testified that Pike eventually directed him to the exact location where the victim's body was found.

After Pike's statement was played for the jury, the State introduced pictures of Pike and Shipp taken at the Knoxville Police Department on the day the statement was given, January 14, 1995, two days after the murder. In the pictures, both Pike and Shipp were wearing pentagram necklaces.

Mark A. Waggoner, an officer with the Knoxville Police Department, testified that he had retrieved a pair of black gloves and two of Slemmer's I.D. cards from the Texaco station on Cumberland Avenue. These items were also made exhibits. Another officer, Lanny Janeway, used a chart to illustrate each of the locations where blood or evidence was found. Photographs of bloody chunks of asphalt, blood drippings on leaves, and pools of blood were introduced into evidence. The bloody piece of asphalt and the victim's bloody clothing were also introduced into evidence.

Special Agent Raymond A. DePriest, a forensic scientist employed by the Tennessee Bureau of Investigation, testified that he had received blood samples taken from the shoes and clothing of Pike and Shipp. Those items that he determined had human blood on them were sent to the DNA unit. Margaret Bush, an employee of the Tennessee Bureau of Investigation assigned to the DNA unit, testified that she had been unable to perform a DNA analysis on the blood taken from

the shoes of Pike and Shipp, but she had determined that the blood samples taken from the clothing of both Pike and Shipp matched the DNA profile of the victim.

Dr. Sandra Elkins, the Knox County Medical Examiner, performed the autopsy on the victim, who was later identified by dental records as Colleen Slemmer, a nineteen-year-old Job Corps student. Dr. Elkins described the victim's body as covered with dirt and twigs. Slemmer was nude from the waist up clothed only with jeans, socks, and shoes. After removing the victim's clothing and cleaning the body, Dr. Elkins had attempted to catalog the slash and stab wounds on the victim's torso by assigning a letter of the alphabet. There were so many wounds that eventually Dr. Elkins decided to catalog only the most serious and major wounds. Dr. Elkins explained that to catalog every wound she would have been required to go through the alphabet again, and stay in the morgue for "three days." Eventually, Dr. Elkins said she "basically threw up [her] hands and just said, enumerable [sic] more superficial slash wounds on the back, arms and chest." In addition, Dr. Elkins said the victim had purple contusions on her knees, indicating fresh bruising consistent with crawling, and defensive wounds on her right arm.

Dr. Elkins described the major slash and stab wounds she had cataloged on the victim's back, arms, abdomen, and chest. She found a six inch gaping wound across the middle of the victim's neck which had penetrated the fat and muscles of the neck. In addition, Dr. Elkins had found ten other slash wounds on the victim's throat. Other slash wounds were on the victim's face, and Dr. Elkins observed what appeared to be a pentagram carved onto the victim's chest. Because the area around each wound was red in appearance, Dr. Elkins concluded that the victim's

-11-

heart had been beating when the wounds were inflicted and she said the victim would not have been rendered unconscious by any of the stab or slash wounds.

Dr. Elkins determined that the victim's death was caused by blunt force injuries to the head. The victim had suffered multiple and extensive skull fractures. From the autopsy, Dr. Elkins determined that the victim had sustained a minimum of four blows to her head; two to the left side of the head, one over the right eye, and one in the nose area. The right frontal area of the victim's skull had been fractured as had the bridge of her nose. However, the major wound, labeled as injury "W", involved most of the left side of the victim's head. Dr. Elkins said that this injury, caused by blunt force to the left side of the victim's head while the right side of the victim's head was against a firm surface, also had fractured the right side of the skull and imbedded a portion of the skull into the victim's brain. Dr. Elkins found small divots in the victim's skull containing black particles from an asphalt chunk which was later determined to have been used to administer the blows. Finally, Dr. Elkins testified that blood in the victim's sinus cavity indicated she had been alive and probably conscious when the injuries were inflicted.

During her testimony, Dr. Elkins utilized the victim's skull to describe the injuries. She testified that in order to determine the cause of death, it was necessary to remove the head of the victim and have the skull prepared by Dr. Murray Marks, a forensic anthropologist at the University of Tennessee. She explained that she had removed the top of the victim's skull in order to remove the brain. Embedded inside the victim's brain as a result of the blunt force were portions of the victim's skull. Dr. Elkins removed those embedded pieces and forwarded them to Dr. Marks. Dr. Marks

-12-

reconstructed the skull, fitting those loose portions into the left side area of the skull. However, those pieces had not completely filled one area on the left side of the victim's skull. Dr. Elkins then showed the jury a piece of skull that had been given to her shortly before the trial and demonstrated that it fit perfectly into the remaining area of the victim's skull. The piece of skull utilized by Dr. Elkins had been taken from the pocket of a jacket which witnesses identified as belonging to Pike.

Pike's jacket had been turned over to law enforcement officials by Job Corps employees. Robert A. Pollock, orientation specialist at Knoxville Job Corps, testified that he had spoken with Pike on January 13, 1995, concerning a misplaced I.D. card. After Pike left his office, Pollock noticed a black leather jacket hanging on the chair where she had sat. The jacket had been hanging on the chair when Pollock locked the room at approximately 4:00 p.m. on January 13th, and it was still there when he returned at 7:30 a.m. on January 17th. Because he had heard over the weekend that Pike was a suspect in this murder investigation, Pollock immediately turned the jacket over to the Job Corps' Safety and Security Captain, William Hudson. Hudson called the Knoxville Police Department and turned the jacket over to Officer Arthur Bohanan when he arrived a short time later.

Officer Bohanan identified the jacket, and it was introduced into evidence. He testified that he had discovered a small piece of bone in the inside pocket of the jacket and had immediately taken it to Dr. Marks at the University of Tennessee. Dr. Marks testified concerning the process by which the victim's skull had been prepared and again demonstrated that the bone fragment given to him by Officer Bohanan fit perfectly into the bone reconstruction of the skull of the victim.

-13-

Following the introduction into evidence of the victim's skull, numerous photographs, and items of the victim's clothing, the State rested its case-in-chief.

Dr. Eric Engum, a clinical psychologist, testified for the defense and stated that he had conducted a clinical interview and had administered a battery of tests to the defendant. Dr. Engum described Pike as an "extremely bright young woman." Dr. Engum explained that Pike "is excellent in problem solving, reasoning, analysis, ah, can pay attention, sustains concentration, can sequence, ah, has excellent receptive and expressive language skills." Pike had a full scale IQ score of 111 which is in the 77th percentile and which was characterized as "remarkable" by Dr. Engum since she had only completed the ninth grade. According to Dr. Engum, the tests unequivocally showed that Pike had no symptoms of brain damage and that she was not insane. However, Dr. Engum concluded that the defendant suffers from a very severe borderline personality disorder and exhibits signs of cannabis (marijuana) dependence and inhalant abuse. He testified that the defendant is not so dysfunctional that she needs to be institutionalized, but instead opined that she has a multiplicity of problems in interpersonal relationships, in controlling her behavior, and in achieving vocational and academic goals.

During direct examination, Dr. Engum opined that the defendant had not acted with deliberation or premeditation in killing Slemmer. Instead Dr. Engum said she had acted in a manner consistent with his diagnosis of borderline personality disorder; she had lost control. He explained that she had danced around when relating the murder to Iloilo because of the emotional release she experienced from having assured through the killing of Slemmer that she could maintain her

relationship with Shipp. When questioned about the piece of skull found in the defendant's coat, Dr. Engum explained that the Defendant actually has no identity and the action of taking and displaying a piece of Slemmer's skull to her friends was the defendant's way of getting recognition, "no matter how distorted" the recognition.

On cross-examination, Dr. Engum stated that there was no question that the defendant had killed Slemmer. He reiterated that his opinion that once the attack began, Pike had literally lost control. However, Dr. Engum admitted that Pike had deliberately enticed Slemmer to the park, carved a pentagram onto Slemmer's chest, bashed Slemmer's head against the concrete, and beaten Slemmer's head with the asphalt. Dr. Engum agreed that Pike's act of carrying weapons with her indicates deliberation. Finally, Dr. Engum conceded that Pike had time to calm down and consider her actions when she left Slemmer during the attack to investigate a noise and determine whether anyone else was in the area.

William Bernet, medical director of the psychiatric hospital at Vanderbilt University, testified that he had reviewed the statements of the defendant and Kimberly Iloilo and the reports of Dr Engum, Dr. Elkins, and Dr. Marks. He concluded that although there were satanic elements in this crime, the pattern was that of an adolescent dabbling in Satanism. He then described the phenomenon of collective aggression, whereby a group of people gather and become emotionally aroused and the end result is that they engage in some kind of violent behavior. On cross-examination, Dr. Bernet admitted that he had spoken neither with the defendant nor any of the other witnesses. Dr. Bernet admitted that he did not have

enough information to offer an expert opinion as to whether Pike acted with intent or premeditation in killing the victim.

Based on this evidence offered during the guilt phase of the trial, the jury found Pike, guilty of first degree murder and conspiracy to commit first degree murder.

In the sentencing phase of the trial, the State relied on the evidence presented at the guilt phase and presented no further proof. The defense, in mitigation, called Carrie Ross, Pike's aunt as a witness. Ross testified that the defendant had experienced no maternal bonding because she was premature and was raised by her paternal grandmother until she died in 1988. Ross said that Pike's family has a history of substance abuse and that Pike's maternal grandmother was an alcoholic who was verbally abusive to Pike. Following the death of Pike's paternal grandmother, Pike was shuffled between her mother and father. According to Ross, Pike's mother's home was very dirty. Pike's mother set no rules for her, and on the occasions that Pike had visited Ross, the defendant had behaved as a "little girl," playing Barbie and dress-up with her eleven-year-old cousin.

On cross-examination, Ross admitted that she had previously described Pike as a pathological liar and that she had been afraid to allow Pike to associate with her own children. Ross also admitted that Pike had been out of control since she was twelve years old.

Glenn Pike, the defendant's father, testified that he had kicked the defendant out of his house twice, the last time in 1989. He admitted that he had signed adoption papers for the defendant prior to her eighteenth birthday. On cross-examination, he admitted that he had forced Pike to leave his home in 1989 because there had been an allegation that the defendant had sexually abused his two-year-old daughter from his second marriage. According to her father, Pike had been disobedient, dishonest, and manipulative when she had lived with him.

The defendant's mother, Carissa Hansen, a licensed practical nurse, testified that Pike had lived with her 95 percent of the time since her paternal grandmother's death. Hansen admitted that she had smoked marijuana with the defendant in order to "establish a friendship." Hansen related that the defendant had attempted suicide by taking an overdose shortly after the death of her paternal grandmother. Hansen also testified that one of her boyfriends had whipped Pike with a belt. Hansen had the boyfriend arrested.

On cross-examination, Hansen admitted that Pike's behavior had been problematic for years. The defendant had begun growing marijuana in pots in her home at age nine. After threatening to run away from home and live on the street, Pike had been allowed to have a live-in boyfriend at age fourteen. Hansen admitted that Pike had wielded a "butcher-knife" against the boyfriend, who had been arrested for whipping her. Hansen also said Pike had lied to her and stolen from her on numerous occasions and had quit high school. Hansen conceded that Pike had been out of control since she was eight years old. Following Hansen's testimony, the defense rested its case.

In rebuttal, the State presented the testimony of Harold James Underwood, Jr., a University of Tennessee police officer who was assigned to secure the crime scene on January 13, 1995. Underwood testified that the defendant came to the scene with three to five other females between four and five p.m that day. Pike asked Underwood why the area had been marked off and questioned him concerning the identity of the victim and whether or not the police had any suspects. None of the other females spoke during the fifteen minutes the group was there. Underwood said Pike appeared amused and giggled and moved around. Underwood noticed that Pike was wearing an unusual necklace in the shape of a pentagram. After learning at roll call on January 14, 1995, that the victim of the murder had a pentagram carved on her chest, he reported Pike's strange behavior and unusual necklace to his superior officers.

Based on the proof submitted at the sentencing hearing, the jury found the existence of the following two aggravating circumstances beyond a reasonable doubt: (1) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (2) "[t]he murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(i)(5) and (6) (1997 Repl.). In addition, the jury found that the State had proven that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. As a result, the jury sentenced the defendant to death by electrocution. The trial court entered a judgment in accordance with the jury's verdict and the Court of Criminal Appeals affirmed. After reviewing the record and

considering the errors assigned by the defendant, we affirm the judgment of the Court of Criminal Appeals.

# I.

## SUFFICIENCY OF THE EVIDENCE: CONVICTIONS

The defendant first challenges the sufficiency of the evidence to support the convictions for first degree murder and conspiracy to commit first degree murder. Specifically, with respect to the conviction for first degree murder, the defendant argues that the State did not offer any evidence to establish deliberation or to establish that the defendant had the opportunity to reflect upon her actions at a time when her mind "was free from the influence of excitement or passion." The defendant also maintains that the evidence is insufficient to sustain the conviction for conspiracy to commit first degree murder.

In analyzing the defendant's assertions, we are guided by the following well-settled principles of law. A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. This Court does not reweigh or reevaluate

the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this Court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). Therefore, on appeal, the State is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence. Consequently, in considering the defendant's claim that the evidence is not sufficient, we must determine, after reviewing the evidence in the light most favorable to the State, whether any rational trier of fact could have found the defendant guilty of premeditated first degree murder and conspiracy to commit first degree murder beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994).

**A. First Degree Murder**

At the time this killing occurred, first-degree murder was defined as an "intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1991). "Intentional" was defined as the "conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(18) (1991 Repl.). "Premeditated act", on the other hand, meant an act "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-201(b)(2) (1991 Repl.). Finally, "[d]eliberate act" was defined as "one performed with cool purpose." Tenn. Code Ann. § 39-13-201(b)(1) (1991 Repl.).

The elements of premeditation and deliberation are questions for the jury which may be established by proof of the circumstances surrounding the killing.

State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Brown, 836 S.W.2d 530, 539 (Tenn. 1992). There are several factors which tend to support the existence of these elements which include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing. Bland, 958 S.W.2d at 660; Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992).

Considering the proof in this record in the light most favorable to the State, as we are required to do, we agree with the Court of Criminal Appeals that the evidence is sufficient to support the jury's finding of premeditation and deliberation. Pike told a friend one day before the killing that she was going to kill the victim. The defendant procured weapons to accomplish the crime, arming herself with a box cutter and a minature meat cleaver, which she borrowed from another individual. Pike then lured the victim to an isolated area to commit the crime by telling the victim that she would share drugs with her. Once they arrived at the isolated location, the defendant attacked the unarmed victim with not one, but two deadly weapons. The attack continued for thirty minutes to an hour. During this extended time, the defendant had ample opportunities in which to reflect upon her actions and choose a course of conduct. By her own admission, the defendant actually ceased the assault long enough to scout out the area and ensure that no one else was around. Certainly, this break in the chain of events provided the defendant time to reflect upon her actions. In fact, in her statement the defendant recounted how she carefully and repeatedly reflected upon her actions and chose to kill the victim to assure that the victim would not testify against her for "attempted murder." Without question, this killing was

-21-

particularly cruel; in fact, particular cruelty is a phrase which merely begins to describe the nature and circumstances of this killing. The defendant attempted to conceal the offense by dragging the victim's body to a secluded area and removing and disposing of the victim's identification cards. The defendant also washed the tops of her shoes at the Texaco service station and rubbed the mud from the bottom of her shoes onto her blue jeans to conceal the blood. Pike calmly disposed of the box cutter and returned the miniature meat cleaver to the person from whom it had been borrowed. Later that same evening, Pike displayed her "souvenir," a piece of the victim's skull, and she gleefully recounted the events of the assault and killing to Iloilo, the same friend to whom, only one day earlier, Pike had proclaimed her intent to kill Colleen Slemmer because "she just felt mean that day."

Clearly the evidence in this record is sufficient to support the elements of premeditation and deliberation and to support the jury's verdict finding the defendant guilty of first degree premeditated murder.

## B. Conspiracy to Commit First Degree Murder

The defendant next contends that the evidence is insufficient to support her conviction for conspiracy to commit first degree murder because the State failed to prove the elements of the offense. Specifically, the defendant contends that there was no proof, other than her "uncorroborated statement" that a box cutter had been used on the victim, and there was no proof that Shadolla Peterson and Tadaryl Shipp attacked the victim.

At the time this killing occurred and at the present time, "[t]he offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense." Tenn. Code Ann. § 39-12-103(a) (1991 Repl.). The offense of conspiracy is aimed at group criminality and is based upon the principle that group criminal activity poses a greater public threat than criminal offenses committed by a single individual. Tenn. Code Ann. § 39-12-103 (1991 Repl.) (Sentencing Commission Comments). While the essence of the offense of conspiracy is an agreement to accomplish a criminal or unlawful act, Owens v. State, 84 Tenn. 1, 3 (1885); State v. Hodgkinson, 778 S.W.2d 54, 58 (Tenn. Crim. App. 1989), the agreement need not be formal or expressed, and it may be proven by circumstantial evidence. State v. Shropshire, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993); Hodgkinson, 778 S.W.2d at 58. "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise. Conspiracy implies concert of design and not participation in every detail of execution." Randolph v. State, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978).

Viewing the evidence in this record in the light most favorable to the State, we have no difficulty concluding that the evidence is sufficient to support the defendant's conviction for conspiracy to commit first degree murder. Iloilo testified that she observed the defendant, the victim, Peterson and Shipp leaving the Job Corps facility together on the night of the murder. Later that evening, Iloilo observed the defendant, Peterson, and Shipp return without the victim. After her return, Iloilo said

that the defendant told her that she had killed the victim, using a meat cleaver to cut the victim's back and a box cutter to cut her throat. Iloilo testified that Pike said the victim had begged "them" to stop cutting her throat and beating her. Iloilo's testimony was consistent with and corroborative of the confession in which Pike said that she and another person whom Pike referred to as "he," accompanied the victim to the isolated location where the killing occurred. Pike said that the other person participated in restraining the victim, cutting the victim, hitting the victim in the head with rocks and asphalt, and dragging the victim's body to a more isolated location. DNA testing revealed that the blood stains found on both Pike and Shipp's clothing matched the victim's blood. Finally, both Pike and Shipp were wearing pentagram necklaces two days after the murder, and a pentagram had been carved onto the victim's chest. Accordingly, the defendant's contention that the evidence is insufficient to support the conviction for conspiracy to commit first degree murder is without merit.

## II.

### MEDIA COVERAGE

The defendant next asserts that the trial court erred by refusing to grant her motion to deny television coverage of the pretrial proceedings in this case. She asserts that media coverage in this case made jury selection difficult, "arguably affected the witness testimony and was generally disruptive of the proceedings." While recognizing that this Court has promulgated a rule which permits media

coverage,[3] Pike nonetheless contends that "the record of jury selection demonstrates intense media coverage made it impossible to get a fair trial."

This Court in December of 1995, adopted Supreme Court Rule 30 as a one-year pilot project to govern media coverage of judicial proceedings in Tennessee. The experimental rule was effective from January 1, 1996, until December 31, 1996. During this experimental period, this Court solicited and considered comments both from members of the general public and from participants in judicial proceedings which had been covered by the media pursuant to the terms of Rule 30. After considering the comments and adopting appropriate amendments, on December 30, 1996, this Court entered an order making Rule 30 permanent.[4]

Section (A)(1) of Rule 30 authorizes "[m]edia coverage of public judicial proceedings in the appellate and trial courts of this State . . . ." However, the media coverage is "subject, at all times, to the authority of the presiding judge to (i) control the conduct of the proceedings before the court; (ii) maintain decorum and prevent distractions; (iii) guarantee the safety of any party, witness, or juror; and (iv) ensure the fair and impartial administration of justice in the pending cause." Further, Section (D)(2) of Rule 30 specifically grants to the presiding judge at a judicial proceeding the discretion to "refuse, limit, terminate or temporarily suspend" media

---

[3]Tennessee Supreme Court Rule 30.

[4]"To ensure that Rule 30 continues to operate in a manner that is in the best interest of the public and compatible with the administration of justice," on August 31, 1998, this Court entered an order again soliciting comments from interested members of the public. The comments must be filed with the Appellate Court Clerk's Office in Nashville by December 29, 1998.

coverage of all or part of a case if necessary to accommodate any of these important interests.

Although the defendant in this case contends that the media coverage "arguably affected the witness testimony and was generally disruptive of the proceedings," she does not cite to any specific portion of the record, nor offer specific reasons as to the ways in which the testimony was affected or the proceedings disrupted. Also, the defendant does not explain how media coverage of the crime would have been less intense had cameras been excluded from the courtroom during the proceedings. Although jury selection was lengthy, in part, due to the media coverage of the crime, there is no assertion, nor proof, that any particular juror was biased because of the media coverage. In addition, there is no indication from reading the transcript that the media coverage itself was disruptive or that any disruptive event occurred during the proceedings. Clearly, a presiding judge's decision to deny a motion to preclude or limit media coverage is not error in the absence of proof that media coverage will compromise one of the important interests set forth in Sections (A)(1) and (D)(2) of Rule 30. The defendant in this case presented no such proof. Therefore, the trial judge did not abuse her discretion under Rule 30 by denying the defendant's motion.

Moreover, the defendant has failed to demonstrate that the media coverage of the pretrial and trial proceedings in this case impinged upon her right to a fair trial. In State v. Harries, 657 S.W.2d 414 (Tenn. 1983), the defendant alleged that the presence of cameras had deprived him of his right to a fair trial. In rejecting this claim, we first stated that Harries had agreed to the media coverage and could not

object on appeal. However, we also stated that had a proper objection been interposed Harries claim would have failed because he had not demonstrated either that the presence of cameras impaired the jurors' ability to decide the case on the evidence alone, or that the trial was adversely affected by the impact of the media coverage on one or more of the participants. See also Chandler v. Florida, 449 U.S. 560, 581-82, 101 S.Ct. 802, 813, 66 L.Ed.2d 740 (1981).

Likewise, the defendant in this case has failed to show either that media coverage of the pretrial and trial proceedings impaired the jurors' ability to decide the case on the evidence alone or adversely impacted one or more of the trial participants. To the contrary, the record is devoid of such proof. Accordingly, this issue is without merit.

## III.

### SUFFICIENCY OF THE EVIDENCE: DEATH SENTENCE

#### A. Aggravating Circumstances

In this case, the jury imposed the death penalty upon finding both that (1) "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," and that (2) "[t]he murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(i)(5) and (6) (1997 Repl.). On appeal, the defendant challenges the sufficiency of the evidence to support these aggravating circumstances. The Court of Criminal Appeals rejected this claim and found the evidence sufficient.

We first address the defendant's claim that the evidence is insufficient to support the (i)(5) aggravating circumstance. In State v. Williams, 690 S.W.2d 517 (Tenn. 1985), we defined "torture" as the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. Id. at 529. With respect to "serious physical abuse beyond that necessary to produce death," we explained in State v. Odom, 928 S.W.2d 18 (Tenn. 1996), that "serious" alludes to a matter of degree, and that the physical abuse must be "beyond that" or more than what is "necessary to produce death." Id. at 26.

In this case, the medical examiner testified that the wounds on the victim's body were too numerous to catalog. The victim's throat had been repeatedly slashed, defensive wounds were found on her right arm, bruises consistent with crawling were found on her knees, and she had sustained at least four heavy blows to her head. Her skull was fractured in several places. A pentagram had been carved onto her chest. According to the medical proof, and the defendant's own statements to the police and to other witnesses, the victim was alive and conscious when these injuries were inflicted upon her. In fact, according to the defendant's statements, some of the wounds were inflicted because the victim would not stop begging for her life. The defendant also admitted, and the crime scene revealed, that the victim repeatedly tried to run away and escape the attack. In fact, the victim was so terrified that she offered to walk to her home in Florida without returning to the Job Corps facility for her belongings in exchange for her life. The merciless assault upon the victim continued for a period of thirty minutes to an hour. Considering this record, we agree with the Court of Criminal Appeals that the evidence is overwhelmingly sufficient to support the jury's finding that "[t]he murder was especially heinous,

atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5) (1997 Repl.).

We also reject the defendant's contention that the evidence is insufficient to support the jury's finding of the (i)(6) aggravating circumstance. This Court has previously held that to establish the applicability of this aggravating circumstance, the State must prove that avoidance of prosecution or arrest was one of the purposes motivating the killing. State v. Bush, 942 S.W.2d 489, 504 (Tenn. 1997); State v. Smith, 868 S.W.2d 561, 581 (Tenn. 1993); State v. Carter, 714 S.W.2d 241, 250 (Tenn. 1986) (avoidance of arrest need not be sole motive for murder). In this case, Pike repeatedly told police that as she was assaulting the victim, she heard a voice telling her that she had to do something to keep the victim from reporting the assault and causing her to go to prison for attempted murder. When the victim begged for her life, Pike responded that she was not going to be "rotting in jail because of [the victim's] stupid ass." Based upon our consideration of the record, we agree with the Court of Criminal Appeals that the evidence was sufficient to support the jury's finding that "[t]he murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(i)(6) (1997 Repl.).

### B. Aggravating vs. Mitigating Circumstances

Finally, the defendant contends that the jury failed to properly consider and weigh the mitigating circumstances against the aggravating circumstances. The weight given aggravating and mitigating circumstances is entirely within the province of the jury. The jury determines whether or not mitigation exists and whether the

aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. State v. Bland, 958 S.W.2d 651, 661 (Tenn. 1997); State v. Barber, 753 S.W.2d 659, 669 (Tenn. 1988). As previously discussed, the State relied upon two aggravating circumstances. In mitigation, the defendant offered proof to show that she was young when the offense was committed, that she had no prior history of criminal activity, that she was under the influence of extreme mental or emotional disturbance when the murder occurred, that her capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law was substantially impaired as a result of mental disease or defect, that she had a difficult childhood, and that she had a personal and family history of substance abuse. Through cross-examination, the State elicited testimony from the defendant's witnesses that she had been difficult, manipulative, and dishonest from an early age, that she previously had threatened an individual with a butcher knife, and that she had been accused of sexually molesting her half-sister. The State also offered rebuttal proof to show that Pike had visited the crime scene with a group of other females on the day the victim's body was discovered and giggled as she asked questions about the murder. Considering the proof in this record, we are of the opinion that the evidence is sufficient to support the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt.

## IV.

## PROPORTIONALITY REVIEW

We must next consider whether the defendant's sentence of death is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1) (D) (1997 Repl.). If this case is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed," the sentence of death is disproportionate. State v. Bland, 958 S.W.2d 651, 665 (Tenn. 1997). However, a sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. Id. at 665. Our role, in conducting proportionality review is not to assure that a sentence "less than death was never imposed in a case with similar characteristics." Id. Instead, our duty "is to assure that no aberrant death sentence is affirmed." Id.

In choosing and comparing similar cases, we consider many variables, some of which include: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances, including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. Id. at 667. When choosing and comparing similar cases we consider the following characteristics of the defendant: (1) prior record or prior criminal activity; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) involvement or role in the murder; (5) cooperation with authorities; (6) presence or absence of remorse; (7) the defendant's knowledge of the helplessness of the victim; and (8) the defendant's capacity for rehabilitation. Id. Comparative

-31-

proportionality review is not a rigid, objective test. Id. at 668. We do not employ mathematical or scientific techniques. In evaluating the comparative proportionality of the sentence in light of the factors delineated above, we rely also upon the experienced judgment and intuition of the members of this Court. Id.

As explained below, considering the nature of the crime and the defendant in light of these factors, we conclude that imposition of the death penalty for the torturous and cruel premeditated killing of this young woman is not disproportionate to the penalty imposed in similar cases. The proof in this case reflects that the eighteen-year-old defendant and the nineteen-year-old victim were acquaintances. Both were female students at the Job Corps facility in Knoxville. Because the victim allegedly had been making unfavorable comments about Pike and her boyfriend, Pike armed herself and lured the victim to an isolated area where she assaulted the victim. The victim died as a result of blunt force trauma to her head. In fact, her skull was virtually shattered. However, over the course of a thirty-minute to one-hour period before her death, Pike stabbed and slashed the victim with the box cutter and the meat cleaver. Pike kicked the victim, beat her with pieces of asphalt, and carved a pentagram onto her chest. The medical testimony and the defendant's statements establish that the victim was alive and conscious during this torturous ordeal. In fact, according to Pike's own statement, the victim begged and bargained for her life. The victim tried to run away, but she was restrained by Pike and her co-conspirators. Pike showed no mercy; instead, she exhibited a total disregard for human life and human suffering when she committed this unprovoked and unjustified premeditated murder.

While Pike had no prior criminal record, her own relatives testified that Pike previously had been violent, manipulative, and dishonest. Although Pike was young at the time this offense was committed, only eighteen years old, she is certainly not the youngest person on death row. See State v. Mann, 959 S.W.2d 503, n. 5 (Tenn. 1997). While Pike is only the second woman to receive a death sentence in Tennessee, there is absolutely no indication that the jury's imposition of the death sentence was motivated by or based upon Pike's gender. Though the defense presented proof that Pike suffers from borderline personality disorder, the defense expert testified that Pike is not insane, but, in fact, is highly intelligent. He admitted on cross-examination that many of Pike's actions relating to the killing were premeditated. Although others were present when the killing occurred and involved to some degree, the proof reveals that Pike was the leader. In fact, in her statement to police, Pike described in chilling detail her leading role in this murder. While Pike cooperated with the authorities by giving a statement and leading them to evidence, she displayed a stunning lack of remorse for committing this horrific crime. In fact, Pike laughed and danced around as she boasted to her friends about the killing. Pike took a piece of the victim's skull with her as a "souvenir" and displayed this trophy to her friends when she recounted how the killing occurred. She returned to the crime scene the day after the murder with a number of other females and giggled as she asked the police officer questions about the killing. Pike's total lack of remorse is also evident from a letter she wrote to her boyfriend, Tadaryl Shipp shortly after the jury had sentenced Pike to death on the first degree conviction. The letter was introduced at the sentencing hearing on Pike's conviction for conspiracy to commit first degree murder, and it is a part of the record in this appeal. In the letter, Pike complained to Shipp

> Ya see what I <u>get</u> for trying to be nice to the hoe? I went ahead and bashed her brains out so she'd die quickly instead of letting her <u>bleed</u> to death and suffer more, and they fuckin <u>FRY</u> me!!! Ain't that some shit?

There is also no evidence that Pike has a capacity for rehabilitation. The testimony of Pike's own relatives reveals that Pike has refused to abide by the applicable rules of society since a very young age. Considering the nature of the crime and the defendant, we conclude that the torturous and cruel murder of this nineteen-year-old woman places Pike into the class of defendants for whom the death penalty is an appropriate punishment. Based upon our review, we conclude that the following cases in which the death penalty has been imposed have many similarities with this case.

In <u>State v. Owens</u>, 746 S.W.2d 441 (Tenn. 1988), the jury convicted the defendant Gaile K. Owens for procuring another to kill her husband. The victim was struck on the head twenty-one times with a tire iron. The blows had driven the victim's face into the floor of the den of his home. His skull was crushed and bone fragments were driven into his brain, as in this case. Also, as in this case, the victim was alive and conscious during the beating, as was evidenced by extensive injuries to his hands and strands of hair between his fingers which indicated that he had been attempting to cover his head with his hands during the beating. Much like this case, Owens offered proof in mitigation to show that she previously had been treated by a psychiatrist on one occasion several years earlier for severe behavioral problems. She also offered testimony to show that she had been a "good prisoner who caused no problems, volunteered to work, and attended Bible study classes." <u>Id.</u> at 448. Also, as in this case, there was no evidence that Owens had a prior criminal record.

As in this case, the jury sentenced Owens to death upon finding two aggravating circumstances: (1) that Owens committed the murder for remuneration, or the promise of remuneration, or employed another to commit the murder for remuneration, or the promise of remuneration and (2) that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(4) and (5) (1982 Repl.).

In State v. Hall, 958 S.W.2d 679 (Tenn. 1997), the twenty-four-year-old defendant murdered his twenty-two-year-old girlfriend by dousing her with gasoline and igniting her body as she sat trapped inside her car. As in this case, Hall exhibited a total disregard for human life and complete indifference to human suffering. Though Hall claimed, as did the defendant in this case, that he initially intended only to frighten the victim, Hall admitted that he never offered assistance to the victim after he realized that her body was completely engulfed by flames. As in this case, Hall's victim suffered excruciating pain and suffering. She was alive, conscious, coherent, and alert as her tongue swelled to the extent that it protruded from her mouth and her eyelids became inverted. She experienced not only the initial pain of the burn injuries, but also the pain from the incisions that were part of the medical treatment for the burns. As in this case, there was no evidence to indicate that Hall had a prior criminal record, though he admitted to abusing alcohol and drugs. Also like this case, a defense expert testified that Hall displayed symptoms of borderline personality disorder, but said Hall was not insane at the time the murder was committed. The jury sentenced Hall to death upon finding, as in this case, two aggravating circumstances: (1) the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce

death; and (2) the murder was committed while the defendant was engaged in commiting or was attempting to commit arson.  Tenn. Code Ann. § 39-13-204(i)(5) and (7) (1991 Repl.).

In State v. Smith, 868 S.W.2d 561 (Tenn. 1993), the forty-year-old defendant was found guilty of the triple premeditated murders of his estranged wife, age thirty-five and her two sons by a previous marriage, age sixteen and thirteen.  With respect to the killing of his two step-sons, the jury found four aggravating circumstances, two of which were also found in this case: (1) the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind; and (2) the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another.  Tenn. Code Ann. § 39-13-203(i)(5) and (6) (1982).[5]  As did the victim in this case, the two young men murdered by Smith suffered extremely torturous deaths.  The sixteen-year-old victim was shot three times: in the right shoulder, the upper chest, and on the inside eyebrow.  Though the last two gunshot wounds had been fatal, the evidence showed that prior to his death, the victim had been stabbed several times in his chest, back, and abdomen with a knife and an awl.  His throat had been slashed, and he had defensive wounds on his hands.  The evidence indicated, as in this case, that the victim had been alive and conscious when the stab and slash wounds were inflicted. The thirteen-year-old victim had not been shot.  Instead his neck had been slashed, and he had been stabbed in the chest and abdomen, much like the victim in this case.  Two of the wounds to his abdomen had cut major veins, and his small bowel protruded from his

_____

[5]The jury also found that the murder was committed while the defendant was engaged in committing a felony and that the defendant committed mass murder.  Tenn. Code Ann. § 39-2-203(i)(7) and (12) (1982).

body through these wounds. This victim also had numerous defensive wounds on his hands. The medical evidence indicated that all of these injuries were inflicted upon him while he was alive and that he bled to death over a period of several minutes. In mitigation, Smith, as did the defendant in this case, presented expert psychological proof that he had personality disorders. The jury sentenced the defendant to death for each of his three convictions for first degree murder.

In State v. Bush, 942 S.W.2d 489 (Tenn. 1997), the eighteen-year-old defendant was convicted of the first degree murder of a seventy-nine-year-old widow. Bush used the victim's friendship with his grandmother to gain access to her home. Once inside, Bush, like the defendant in this case, brutally murdered the victim without any provocation by savagely beating her with a stick and by stabbing her forty-three times. Like the defendant in this case, Bush later boasted to acquaintances about the killing, recounting how he had practiced karate on the victim. Bush, like the defendant in this case, presented proof in mitigation relating to his youth, troubled childhood, mental disease or defect, and lack of a prior criminal record. The jury imposed the death penalty upon finding the same two aggravating circumstances which were found by the jury in this case: (1) the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; and (2) the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another. Tenn. Code Ann. 39-13-204(i)(5) & (i)(6) (1991 Repl).[6]

---

[6]Although the trial judge erroneously charged the jury in the language of the 1989 statute, in Bush we held that the error was harmless beyond a reasonable doubt, concluding that the proof established that the murder was heinous, atrocious, or cruel in that it involved torture or depravity of

In <u>State v. Mann</u>, 959 S.W.2d 503 (Tenn. 1997), the twenty-two-year-old defendant was convicted of premeditated first degree murder for the brutal killing of the victim, a sixty-two year old widow, who lived near him and who had befriended Mann and his family. Mann chose to burglarize her home because he knew she was hearing-impaired. When the victim walked out of her bedroom and surprised Mann in the act of burglarizing her home, he brutally assaulted and murdered her, inflicting *at least* forty wounds upon the victim, including fifteen blows to the head, eleven stab wounds to the chest, and fourteen puncture wounds to her abdomen, all of which resulted in pain for the victim. In addition, the defendant digitally raped and manually strangled the victim. As in this case, Mann's victim was alive and conscious and calling out her attacker's name throughout the entire ordeal. The jury imposed the death penalty upon finding, as in this case, two aggravating circumstances: (1) the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; and (2) the murder was committed while the defendant was engaged in committing a felony, burglary. Tenn. Code Ann. § 39-13-204 (i)(5) and (7) (1991 Repl.).

In <u>State v. Barber</u>, 753 S.W.2d 659 (Tenn. 1988), the twenty-nine-year-old defendant was convicted of first degree murder for killing a seventy-five-year-old woman who lived alone. Barber and his brother had broken into the victim's home to rob her. When the victim recognized Barber's brother, Barber attacked the victim, repeatedly striking her head with a crescent wrench. She was alive and conscious during the attack as was evidenced by the defensive wounds on her arms and hands.

---

mind. Tenn. Code Ann. § 39-13-203(i)(5) (1977 & 1982) (Repealed).

As mitigation, Barber, like Pike, relied upon his youth. The jury imposed the death penalty upon finding that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5) (1982).[7]

In State v. McNish, 727 S.W.2d 490 (Tenn. 1987), the twenty-nine-year-old defendant was convicted of the first degree murder of a seventy-year-old widow. As did the defendant in this case, McNish repeatedly struck the victim in the head fracturing her skull in several places. As in this case, the proof showed that the victim was alive and conscious during the attack. The jury imposed the death penalty upon finding one aggravating circumstance: the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203 (i) (5) (1982).

In State v. Melson, 638 S.W.2d 342 (Tenn. 1982), the defendant, a farm foreman, was convicted of first degree murder for killing the farm owner's wife. As in this case, the victim's head was repeatedly beaten with such force that portions of her skull were embedded into her brain. Trauma to her arms and hands demonstrated that, like this case, the victim was conscious and attempting to defend herself during some portion of the ordeal. As in this case, Melson had no prior record of significant criminal activity. The jury imposed the death penalty upon finding the same two aggravating circumstances present in this case: (1) the murder

---

[7]The jury also relied upon the felony-murder aggravating circumstance as a basis for imposition of the death penalty. In Barber v. State, 889 S.W.2d 185, 189-90 (Tenn. 1994), this Court held the jury's consideration of that aggravating circumstance harmless error beyond a reasonable doubt.

was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; and (2) that the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another. Tenn. Code Ann. § 39-2-203(i)(5) and (6) (1977).

Though no two cases are precisely the same, the above cases have many similarities with the crime for which Pike has been convicted and sentenced. In all eight of these cases the victims were savagely beaten with a blunt instrument or repeatedly stabbed or both. Moreover, in all of these cases, as in the present case, the victims were conscious and experienced the pain and horror of the attacks. Likewise, all eight of the defendants were acquainted with the victims as was Pike in this case. Like Pike, many of these eight defendants relied upon their youth, troubled childhood, and mental difficulties as mitigation. Three of the eight defendants were under the age of twenty-five, and Bush, like Pike, was eighteen years old when the murder for which he was convicted occurred. In all eight cases, the jury found the (i)(5) aggravating circumstance. In three of the eight cases, the jury found both the (i)(5) and the (i)(6) aggravating circumstances. After reviewing the many cases discussed above and many other cases not herein discussed,[8] we are of the opinion that the penalty imposed by the jury in this case is not excessive nor disproportionate to the penalty imposed for similar crimes.

---

[8]State v. Caughron, 855 S.W.2d 526 (Tenn. 1993); State v. Harris, 839 S.W.2d 54 (Tenn. 1992); State v. Black, 815 S.W.2d 166 (Tenn. 1991); State v. Payne, 791 S.W.2d 10 (Tenn. 1990); State v. Jones, 789 S.W.2d 545 (Tenn. 1990); State v. Miller, 771 S.W.2d 401 (Tenn. 1989); State v. Poe, 755 S.W.2d 41 (Tenn. 1988); State v. Johnson, 743 S.W.2d 154 (Tenn. 1987); State v. House, 743 S.W.2d 141 (Tenn. 1987). We have also reviewed cases in which the defendant received a sentence of life imprisonment or life imprisonment without the possibility of parole. However, in none of those cases did the victims suffer torture and cruelty at the hands of the defendant comparable to that inflicted upon the victim in this case by this defendant.

# V.

## CONCLUSION

In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c)(1) (1997 Repl.), and the principles adopted in prior decisions of this Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in an arbitrary fashion, that the evidence supports the jury's finding of the statutory aggravating circumstances, and the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(A) - (C) (1997 Repl.). We have considered the defendant's assignments of error and determined that none require reversal. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals, authored by Judge David H. Welles, and joined in by Judge Thomas T. Woodall and Senior Judge John K. Byers. Relevant portions of that opinion are published hereafter as an appendix. The defendant's sentence of death by electrocution is affirmed. The sentence shall be carried out as provided by law on the 5th day of February, 1999, unless otherwise ordered by this Court or other proper authorities.

_____
FRANK F. DROWOTA, III,
JUSTICE

**Concur:**
Anderson, C.J.,
Birch, Holder, Barker, JJ.

# Appendix
**(Excerpts from the Court of Criminal Appeals' Decision)**

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

## JULY SESSION, 1997

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | **)** | **C.C.A. NO. 03C01-9611-CR-00408** |
| | **)** | |
| Appellee, | **)** | |
| | **)** | |
| | **)** | **KNOX COUNTY** |
| **VS.** | **)** | |
| | **)** | **HON. MARY BETH LEIBOWITZ** |
| **CHRISTA GAIL PIKE,** | **)** | **JUDGE** |
| | **)** | |
| Appellant. | **)** | (First Degree Murder-Death Penalty) |

## ON APPEAL FROM THE JUDGMENT OF THE CRIMINAL COURT OF KNOX COUNTY

FOR THE APPELLANT:

WILLIAM C. TALMAN
P.O. Box 506
Knoxville, TN 37901-0506

JULIE A. MARTIN
P.O. Box 426
Knoxville, TN 37901-0426

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

KATHY MORANTE
Assistant Attorney General
425 5th Avenue North
Nashville, TN 37243

RANDALL E. NICHOLS
District Attorney General

WILLIAM CRABTREE
S. JO HELM
Assistant District Attorneys General
City-County Building
Knoxville, TN 37902

OPINION FILED: November 26, 1997

AFFIRMED

DAVID H. WELLES, JUDGE

# __OPINION__

## Change of Venue

The Defendant argues that the trial court erred by failing to grant her motion for a change of venue. She maintains that a majority of prospective jurors admitted that they had heard detailed information about the case. The Defendant cites the United States Supreme Court decision in Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), in support of the proposition that a change of venue should be granted if extensive pretrial publicity was such that the court should presume the jury is tainted even if prospective jurors stated that they would be able to set aside what they had seen or heard.

However, in Dowd, jury selection lasted more than four weeks. Also the Supreme Court specifically stated that due to "swift, widespread and diverse methods of communication," it is not required that jurors be totally ignorant of the facts and issues involved. 366 U.S. at 722, 81 S.Ct. at 1642. The court also stated that "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." 366 U.S. at 723, 81 S.Ct. at 1643. In Dowd, the panel consisted of 430 persons. The court itself excused 268 of those persons due to their fixed opinions of guilt, and 103 were excused because of their conscientious objection to the death penalty. 366 U.S. at 727, 81 S.Ct. at 1645. The *voir dire* record indicated that 370 of the prospective jurors entertained some opinion as to guilt, ranging from mere suspicion to absolute certainty. Of the twelve jurors selected, eight thought the Defendant was guilty. Id.

In the present case, although many potential jurors had indicated that they had heard something about the case in the media, every juror who said he or she was familiar with the case said that he or she could disregard the reports and render an impartial decision. All potential jurors who said they could not disregard the reports were excused for cause. The Defendant has cited no specific response from any seated juror that was troublesome.

**Excusal of Jurors**

The Defendant asserts that the trial court impanelled a jury that was pro-death penalty and improperly excused for cause those prospective jurors that indicated that they were opposed to the death penalty. The Defendant suggests that the trial court erred in denying her proposal that a "don't ask, don't tell," procedure be used whereby jurors would not be required to tell the court about their personal feelings about the death penalty.

In Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), the United State Supreme Court reaffirmed as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment the test of "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" In State v. Alley, 776 S.W.2d 506, 518 (Tenn. 1989), cert. denied, 493 U.S. 1037, 110 S.Ct. 758 (1990), the Tennessee Supreme Court held that "the trial court's finding of the bias of a juror

because of his views of capital punishment shall be accorded a presumption of correctness and the burden shall rest upon the Defendant to establish by convincing evidence that that determination was erroneous."

The Defendant notes that in the present case the trial court examined prospective jurors extensively regarding their thoughts about the death penalty and allowed counsel to examine those who indicated that they had a problem with the death penalty in an effort to rehabilitate them. The Defendant cites no prospective juror who was excluded that should not have been. Applying the standard as set forth in Alley, the Defendant has failed to establish by convincing evidence that the court's actions were erroneous. This issue is without merit.

## Use of the Skull as Evidence

The Defendant next complains that pursuant to Rule 403 of the Tennessee Rules of Evidence, the skull of the victim should have been excluded because its probative value was substantially outweighed by its prejudicial effect. The Defendant asserts that the skull was also cumulative evidence because prior to its admission, numerous photographs of the skull were admitted to show the damage to the victim's head.

The State argues that the introduction of the skull was an important portion of the medical testimony. The medical examiner testified that she had sent the skull to a forensic anthropologist to be reconstructed because she could not tell exactly what had happened without the reconstruction. The skull was used by

the medical examiner to show the amount of force that was applied to it, as well as the weapon that was used. Pieces of asphalt were embedded in the skull.

In this case, the skull had been thoroughly cleansed and was no more prejudicial or gruesome than a model diagram would have been. Dr. Elkins, the medical examiner, testified that the reconstructed skull would illustrate to the jury what had occurred to the victim and demonstrate the amount of force that was applied as well as the type of weapon used to inflict the head injuries. There is no question that the nature and type of injuries sustained by the deceased and the manner in which death occurred were relevant considerations by the jury. Moreover, the skull was used to illustrate that the piece of skull found in the Defendant's jacket fit perfectly into the reconstructed skull. The skull was, therefore, highly relevant in establishing the circumstances surrounding the offense. See State v. Cazes, 875 S.W.2d 253, 263 (Tenn. 1994); cert. denied, 115 S.Ct. 743, 130 L.Ed2d 644 (1995); State v. Morris, 641 S.W.2d 883, 888 (Tenn. 1982). This issue is without merit.

### Cruel and Unusual Punishment

The Defendant contends that the punishment imposed upon her, death by electrocution, is cruel and unusual punishment under the state and federal constitutions. However, this issue has been previously decided by the Tennessee Supreme Court and determined to be without merit. See State v. Cazes, 875 S.W.2d 253 (Tenn. 1994); State v. Howell, 868 S.W.2d 238 (Tenn. 1993); State v. Black, 815 S.W.2d 166 (Tenn. 1991).

**Peremptory Challenges**

The Defendant contends that at the time of the offense, the rules in effect gave the Defendant fifteen (15) peremptory challenges compared to the State's eight. See Rule 24(d), Tenn. R. Crim. P. (1995). However, at the time of trial, the rules had been changed to give an equal number of peremptory challenges to both the Defendant and the State. See Rule 24(d), Tenn. R. Crim. P. (1996). The Defendant argues that application of the new rule violated the *ex post facto* provision of the Tennessee Constitution which requires that rules not be applied to events which occurred prior to their enactment.

The term "ex post facto" as used in Article I, § 10, cl. 1, of the U.S. Constitution, provides that "[n]o state shall ... pass any ... ex post facto law." The Tennessee Constitution's ex post facto prohibition found in Article I, § 11, provides:

> That laws made for the punishment of acts committed previous to the existence of such laws, and by them only declared criminal are contrary to the principles of a free Government; wherefore no Ex post facto law shall be made.

Two critical elements must be present for a law to fall within the prohibition. First, it "must be retrospective, that is, it must apply to events occurring before its enactment"; and second, "it must disadvantage the offender affected by it." Miller v. Florida, 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987) (quoting Weaver v. Graham, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17

(1981)); State v. Ricci, 914 S.W.2d 475, 480 (Tenn. 1996). Furthermore, Tennessee Code Annotated section 39-11-112 provides that:

> whenever any penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, any offense, as defined by the statute or act being repealed or amended, committed while such statute or act was in full force an effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense.

Yet, the United States Supreme Court has held that laws which change a rule of evidence, but which do not increase the punishment nor change the elements of the offense or the ultimate facts necessary to establish guilt, but only remove existing restrictions on the competency of certain classes of evidence or of persons as witnesses do not constitute ex post facto laws. State v. Bragan, 920 S.W.2d 227, 241 (Tenn. Crim. App. 1995) (citations omitted). In Dobbert v. Florida, 432 U.S. 282, 293, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), the Supreme Court held that the prohibition of ex post facto laws does not extend to every change of law that "may work to the disadvantage of a defendant." Instead, it is intended to secure "substantive personal rights" from retroactive deprivation and does not "limit the legislative control of remedies and modes of procedure which do not affect matters of substance." Id. Thus, laws which change rules of procedure but which do not affect any substantial right of a defendant are not ex post facto laws.

Here, it is apparent that the trial court applied a procedural rule that had been amended after the commission of the crimes in question. The Defendant also claims that the right to a fair and impartial jury was impaired by the increase

in peremptory challenges for the State. However, the Defendant has not proffered any evidence that the jury, as it was composed by the State's using the additional peremptory challenges, prevented her from receiving a fair trial. Absent proof that the Defendant was disadvantaged or that a substantive right was impaired by the amended procedural rule, we cannot conclude that an ex post facto violation occurred. This issue is without merit.

## Sentencing on the Conspiracy Conviction

The Defendant argues that the trial court erred in sentencing the Defendant to a consecutive sentence of twenty-five (25) years for the conviction of conspiracy to commit first-degree murder. The Defendant complains that the trial court inappropriately used the aggravating circumstance that the crime was especially cruel to sentence her to the maximum sentence. She further complains that the trial court erred in determining that she was a dangerous offender and ordering her to serve the sentence consecutively to the death sentence.

When an accused challenges the length, range, or the manner of service of a sentence, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In conducting a de novo review of a sentence, this court must consider: (a) the evidence, if any, received at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement that the Defendant made on his own behalf; and (g) the potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § § 40-35-102, 1-103, and -210; see State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

At the sentencing hearing, the State called as its only witness Officer Debbie Wade, a Corrections Officer with the Knox County Sheriff's Department. She testified that on the day the Defendant was sentenced to die, she gave Officer Wade a letter and requested that it be passed to her co-Defendant, Tadaryl Shipp. Officer Wade gave the letter to her lieutenant and was told not to pass it to Mr. Shipp. The letter was introduced into evidence and read as follows:

> Tadaryl, hey, love, I just wanted you to know how
> much I love you. I have ten months to live. Imagine
> that. I would spend every moment with you if I could,

baby. I want to tell you to tell them you lied in your statement and go along with mine. Do you have a copy of mine? If not, I'll give you one. Okay? I love you big bunches, baby, and no matter what they do to me they can't change what's in my heart. Please write me. I miss you so much. You see what I get for trying to be nice to that hoe. I went ahead and bashed her brains out so she would die quickly instead of letting her bleed to death and suffer more and they fuckin FRY me. Ain't that some shit. Please write and tell me what you're feeling. Baker said he would give you some paper and shit while you are out there. Also tell your lawyer if he wants me to I'll testify, testify for you, I will. Love you for the rest of my life. Little devil.

The trial court classified the Defendant as a Range I, standard offender on the conviction for conspiracy to commit first degree murder. The trial court also considered several enhancement and mitigating factors in setting the sentence above the minimum presumptive sentence of fifteen (15) years. First, the trial court applied enhancement factor number (2), that "[t]he Defendant was a leader in the commission of an offense involving two (2) or more criminal actors." Tenn. Code Ann. § 40-35-114(2). The trial judge then stated that factor number (5), that "[t]he Defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense," would not be relied upon heavily because it had already been used in sentencing the Defendant to death on the other count. Tenn. Code Ann. § 40-35-114(5). Factor number (7), that "[t]he offense involved a victim and was committed to gratify the Defendant's desire for pleasure and excitement," factor number (9), that "[t]he Defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense," and factor number (10), that "[t]he Defendant had no hesitation about committing a crime when the risk to human life was high," were

also found to be applicable. Tenn. Code Ann. §§ 40-35-114 (7),(9), and (10). The trial court found that no mitigating factors were applicable.

We find error with only one of the trial court's applications of enhancement factors. The trial judge held that the Defendant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(10). We believe that the court improperly applied this enhancement factor. Enhancement factor (10) refers to the defendant having "no hesitation about committing a crime when the risk to human life is high." This Court has previously recognized that factors which are inherent in a particular offense, even if not designated as an element, should not be given substantive weight in increasing a sentence. See, e.g., State v. Scott, 735 S.W.2d 825, 830 (Tenn. Crim. App. 1987). We conclude that the risk to human life is inherent in the grading of the offense of conspiracy to commit first-degree murder. According to Tennessee Code Annotated section 39-12-107, "conspiracy is an offense one (1) classification lower than the most serious offense that is the object of the conspiracy." First-degree murder is classified as a capital offense, therefore conspiracy to commit first-degree murder is a Class A felony, a class reserved for only the most serious offenses.

Moreover, the indictment contains allegations in support of the element of conspiracy that an overt act be taken, that the Defendant and two others left the Job Corps center, took the victim to an isolated location and attacked her with a box cutter. Not only is the risk to human life inherent in the offense, in the case sub judice, high risk acts were included in the indictment as charged in support

of an element of the crime.  See Tenn. Code Ann. § 39-12-103(a), (d). Enhancement factors may be applied "if not themselves essential elements of the offense as charged in the indictment." Tenn. Code Ann. § 40-35-114.  For both of these reasons, we conclude that enhancement factor should not have been applied.

The evidence produced at trial, including the Defendant's own statement, and the letter introduced at the sentencing hearing would certainly support the factor that she was a leader in the commission of the offense.  The statement of the Defendant, the testimony concerning her recounting of the incident to others, the fact that she carried a piece of the victim's skull as a souvenir, and her return to the scene were evidence of her desire for excitement and pleasure.  Again, by her own statement, the Defendant admitted carrying a deadly weapon.

Although we disagree with the trial court's finding that the Defendant's age and lack of a significant history of prior criminal activities were not applicable mitigating factors, we cannot conclude that the trial court erred in sentencing the Defendant to the maximum sentence of twenty-five (25) years.  Clearly, when the applicable enhancing factors are weighed against the mitigating factors, the record supports the trial court's sentence.

The trial court found that consecutive sentences were warranted because the Defendant is a dangerous offender whose behavior indicates little or no regard for human life and had no hesitation about committing a crime in which the risk to human life was high.  See State v. Wilkerson, 905 S.W.2d 933, 937-39

(Tenn. 1995). Again, given the circumstances surrounding this offense, especially the heinous nature of the crime and the fact that the Defendant showed no remorse, we conclude that the Defendant met the criteria for consecutive sentencing and the trial court did not abuse her discretion in ordering such. The sentencing issues raised by the Defendant are without merit.

## CONCLUSION

Upon careful review of the record, we conclude that the Defendant has offered no grounds that warrant relief from her convictions of premeditated first degree murder and conspiracy to commit first degree murder. Moreover, we conclude that the Defendant has failed to establish any ground warranting relief from the sentence of death and the consecutive sentence of twenty-five (25) years.

Therefore, after a thorough review of the issues and the record before us as mandated by Tennessee Code Annotated section 39-13-206(b) and (c), and for the reasons stated herein, we affirm the appellant's sentence of death. We conclude that the sentence was not imposed in an arbitrary fashion, the evidence supports the jury's finding of the aggravating circumstances, and the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances. Moreover, a comparative proportionality review, considering both the circumstances of the crime and the nature of the appellant, convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.

Accordingly, the judgment of the trial court is affirmed.