# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 8, 2002

## STATE OF TENNESSEE v. ERNEST LEE LITTLES

**Direct Appeal from the Circuit Court for Obion County**
**No. 0-207    William B. Acree, Jr., Judge**

---

**No. W2001-01706-CCA-R3-CD - Filed June 25, 2002**

---

An Obion County Circuit Court jury convicted the defendant, Ernest Lee Littles, of rape of a child, a Class A felony. The trial court sentenced him as a child rapist to twenty years in the Tennessee Department of Correction, with 100% of the sentence to be served. In his appeal as of right, the defendant claims only that there was insufficient evidence to support his conviction. We affirm the judgment of the trial court but remand for entry of a corrected judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded for Entry of Corrected Judgment**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Clifford K. McGown, Jr., Waverly, Tennessee (on appeal); Joseph P. Atnip, District Public Defender, Dresden, Tennessee (of counsel on appeal); and Charles Perry Roney, Union City, Tennessee (at trial), for the appellant, Ernest Lee Littles.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and James T. Cannon, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In June of 2000, the defendant was indicted for the August 1994 rape of his eleven-year-old daughter, J.L.[1] Following a jury trial on November 27, 2000, he was convicted of rape of a child. On February 15, 2001, the defendant filed a Motion for Judgment of Acquittal, or in the Alternative,

---

[1]It is the policy of this court to refer to minor victims of sexual abuse by initials only. Although the victim was married at the time of the trial and, thus, had changed her last name, we will refer to her by the initials which she had at the time of the incident.

a Motion for a New Trial, which was denied by the trial court after a hearing. He then filed a timely notice of appeal, questioning the sufficiency of the evidence.

## **FACTS**

The victim, J.L., testified that, as of the time of the trial, she was 17 years old and had been married for almost ten months. She acknowledged the defendant is her father. The victim stated that she was 11 years old in August of 1994 when the rape occurred. At the time of the incident, she attended Black Oak Elementary School and lived with her older brother, her younger sister, and her mother and father in Hornbeak, Tennessee.

J.L. said she became ill at school sometime in August 1994, and her father came and picked her up. When they arrived home, the house was empty because her brother and sister were at school and her mother was at work. J.L. said she changed into a T-shirt and shorts, put a videotape in the VCR, and sat down on the couch. J.L. then testified as to what occurred as she and her father were alone in the house:

> Q. Did you lay down [on the couch] at any point?
>
> A. Yes, sir.
>
> Q. Did you ever go to sleep?
>
> A. No, sir.
>
> Q. What did you do?
>
> A. I pretended to be asleep.
>
> Q. Now, why would you pretend to be asleep?
>
> A. Because my father was touching me.
>
> Q. This was after you laid down?
>
> A. Yes, sir. He had come in from outside, and I was watching the movie, and he started touching me, and I pretended to be asleep.
>
> Q. What did you think that that would do if you pretended like you were asleep?
>
> A. That he'd either stop, or he'd get finished and just leave me alone.

The State then asked J.L. several questions concerning the extent of the defendant's conduct during the incident:

Q.  Where was [the defendant] touching you?

A.  My whole body.  My vagina, my breasts.

Q.  Now, was this on top of your clothes, underneath your clothes, or both?

A.  Both.

Q.  Okay.  What was the next thing that he did?

A.  He penetrated my vagina with his finger.

Q.  Now, you had shorts on?

A.  Yes, sir.

Q.  How did he do this?

A.  He moved 'em to the side.

Q.  You're talking about the pants leg, or the tops, or what?

A.  The crotch part, he moved sideways.

Q.  Did he do anything else?

A.  Yes, sir.

Q.  What else did he do?

A.  He performed oral sex on me.

Q.  What do you mean by that, [J.L.]?

A.  He was kissing and messing with my vagina with his mouth.

Q.  During this entire period, did you remain pretending to be asleep?

A. Yes, sir.

Q. Did he stop on his own?

A. Yes, sir.

J.L. conceded that she gave her father a poem the preceding Christmas that described her love for him. This poem was entered into evidence as an exhibit. She also said that she saw her father and some other relatives at Wal-Mart a few weeks before trial. Her father approached her in the store and asked her to give him a hug, which she did. She testified that she told her father that she wished all of this was over. At trial, she said that what had happened was "very tragic" and that she would always love her father.

J.L. denied ever accusing another adult of molesting her. She acknowledged that there was an incident at her grandmother's house where she suddenly woke up and her grandmother's boyfriend was right in front of her, and it scared her. She said his presence made her feel uncomfortable and that her grandmother had not been in the room when the incident happened. J.L. said that everything she had testified to concerning her father's actions was true. However, she said she still loved her father "because every child loves their father no matter what they do."

Lola Mae Goodman testified that she is J.L.'s mother and had been previously married to the defendant for seventeen years before they divorced in March of 1999. Goodman testified that she, the defendant, their two daughters, and their son were living in Hornbeak in August of 1994. At that time, she was employed at Superior Fireplace, and the defendant recently had been laid off from his job and was about to begin working at Superior Fireplace. In August of 1994, Goodman noticed that J.L. had started sleeping in sweat pants, despite the heat and the time of the year, and said that J.L. had been sleeping in sweat pants ever since that time. Prior to August of 1994, J.L. had slept in a gown. Goodman also noticed that J.L. became very concerned about her younger sister, N.L. In fact, J.L. would not let N.L. go anywhere alone, even after J.L. got married. Goodman described J.L.'s behavior toward N.L. as "[v]ery possessive . . . [p]ast protective."

Goodman testified that the defendant tried to stop paying child support for J.L. when J.L. got married. Since Goodman could not afford to hire an attorney to take J.L. off child support, the defendant continued to pay child support for J.L., as well as the other children. Goodman said she regularly cashed the child support checks and gave half of the money back to the defendant. She said that the court had instructed the defendant that he would have to pay child support for J.L. as long as she was still in school.

Lieutenant Rick Kelly of the Union City Police Department testified that he first became involved in this case on May 23, 2000, when he questioned the defendant about J.L.'s allegations of sexual abuse. Lieutenant Kelly and Officers Jackson and Whaley questioned the defendant at the police department. The defendant was advised of his Miranda rights and signed a waiver of his

-4-

rights before questioning began. Kelly said the defendant was not arrested at the time of questioning and was told that he could leave at any time. Kelly testified regarding the defendant's statement:

> Q. Tell us what [the defendant] told you.
>
> A. First, he denied any contact with [J.L.] in an inappropriate way, and then he admitted to touching her breasts. He denied any other contact. He then admitted that he touched her breasts and fondled her with his fingers in her vagina area. Again denied any other contact. He finally admitted that, yes, he did it, he fondled her breasts, fondled her vagina with his fingers, and performed oral sex on her.

After the defendant made this statement, Kelly and the other officers placed the defendant under arrest.

At the conclusion of the State's proof, the State elected to rely upon the act of cunnilingus for the charge of rape of a child.

The defense called only one witness, Linda Crain, the defendant's mother. Crain stated that she was aware of the charge against her son, and identified the victim, J.L., as her granddaughter. She said that J.L. had made allegations of sexual abuse against Crain's ex-boyfriend:

> Q. Would you please tell the Court what happened?
>
> A. [J.L] was at my house one day, and my ex-boyfriend –
>
> Q. What was his name?
>
> A. Jerry Wayne Dilly.
>
> Q. Okay.
>
> A. And he come out of my bathroom, and she was laying on the couch flat of her belly, and he come in – he was coming from the bathroom, and the way my kitchen is, you come from the bathroom into the kitchen, and I was standing there cooking breakfast. Well, she didn't say nothing until 9 o'clock that night, after they left from my house, and she told her daddy at 9 o'clock that he had touched her, and which I was there and didn't nothing go on. I seen the man when he come out of the bathroom into the kitchen.

The State objected to Crain's statements as hearsay, and the trial court sustained the objection. The court instructed the jury, "You shall disregard the answer – or you should disregard the testimony of Ms. Crain as to what her son told her [about J.L.'s accusation of sexual abuse against Crain's ex-boyfriend]." Thus, the only defense proof was testimony which the jury was instructed to disregard.

## ANALYSIS

### Sufficiency of the Evidence

The only issue on appeal is the defendant's claim that the evidence at trial was insufficient to convict him of rape of a child. He argues that "the evidence fails to establish [his] guilt beyond a reasonable doubt." However, we respectfully disagree.

Where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). See also State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). This standard applies to convictions that are the result of direct evidence, circumstantial evidence, or both. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Jury verdicts in criminal cases are given considerable weight by the reviewing court. A guilty verdict that is approved by the trial judge accredits the testimony of the State's witnesses and resolves all conflicts in favor of the theory of the State. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). Upon review, "the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom." Id. (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). A guilty verdict removes the defendant's initial presumption of innocence and replaces it with a presumption of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

The defendant was convicted of rape of a child, which is "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (1997). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7) (1997).

The victim, J.L., testified that the defendant touched her breasts, penetrated her vagina with his finger, and performed oral sex on her. Lieutenant Kelly testified that the defendant admitted that he had "fondled [the victim's] vagina with his fingers, and performed oral sex on her." The defendant's only witness was his mother whose testimony the jury was instructed to disregard.

Considering the evidence in a light most favorable to the State, we conclude that a rational jury could have easily found evidence of all the elements of rape of a child beyond a reasonable doubt. Therefore, we conclude that the evidence against the defendant was sufficient to support his conviction. However, we remand for entry of a corrected judgment because the conviction offense was omitted from the judgment.

## CONCLUSION

We conclude there was sufficient evidence to support the defendant's conviction of rape of a child. We affirm the judgment of the trial court but remand for entry of a corrected judgment to reflect the defendant's conviction offense.

_____
ALAN E. GLENN, JUDGE