IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 20, 2002 Session

## STATE OF TENNESSEE v. MAURICE LAMONT DAVIDSON

**Appeal from the Criminal Court for Davidson County**
**No. 2000-B-736      Seth Norman, Judge**

---

**No. M2002-00178-CCA-R3-CD - Filed January 22, 2003**

---

The Defendant, Maurice Lamont Davidson, was convicted by a jury of one count of second degree murder, one count of voluntary manslaughter, and one count of attempted voluntary manslaughter. The trial court subsequently sentenced the Defendant to twenty-two years for the second degree murder, three years for the voluntary manslaughter, and two years for the attempted voluntary manslaughter, with the first two sentences to be served concurrently and the third sentence to be served consecutively, all to be served in the Department of Correction.  In this direct appeal, the Defendant contends that the trial court erred in excluding certain expert testimony; that the evidence is not sufficient to support his convictions; and that the sentences are excessive.  We affirm the Defendant's convictions, reduce his sentence for the second degree murder to twenty years, and order that his sentence for attempted voluntary manslaughter be served concurrently.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed in Part;**
**Modified in Part; Remanded**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOE G. RILEY and ALAN E. GLENN, JJ., joined.

Richard McGee, Nashville, Tennessee, for the appellant, Maurice Lamont Davidson.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Pamela Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Defendant, Maurice Lamont Davidson, lived with his mother and his younger sister, Darla Davidson, in a small house on Mexico Street in Nashville, Tennessee.  Also living with the Defendant at the time in question was Darla's infant daughter, Roneisha.  Expert testimony introduced at trial established that the Defendant is mildly mentally retarded and suffers from some stage of schizophrenia.

On December 4, 1999, Rodney Martin, Roneisha's father and Darla's ex-boyfriend, came to the Defendant's house and picked up Roneisha for the day. Rodney arrived in his car, a distinctive red Pontiac with which the Defendant was familiar. Later that night, Rodney arrived at his mother's house with the baby. Ruth Martin, Rodney's mother, testified that she had received a phone call from Darla twenty to thirty minutes before Rodney arrived. After his arrival, Rodney told his mother about some trouble he had had with Darla's current boyfriend earlier in the day. Ms. Martin determined that Rodney's sister Angela should accompany Rodney when he returned Roneisha to Darla. Angela arrived at Ms. Martin's house with her sister Lisa and Lisa's fiancé, Edward Simmons. Rodney, Angela, Lisa and Edward then left in two cars to return Roneisha to Darla; neither of the two cars was Rodney's. Of these four people traveling to the Defendant's house, the Defendant knew only Rodney.

Darla testified that she was lying down when she heard the Defendant say, "who are all these people pulling up outside?" It was approximately 11:00 p.m. Darla went to the door and saw Rodney and Angela coming up the steps with Roneisha and her carseat. She opened the door and Angela and Rodney entered the house. An argument between Darla and Angela ensued. The Defendant tried to separate Darla and Angela, at which point Simmons, who had subsequently entered the house uninvited, got involved. Simmons and the Defendant struggled, and the Defendant fired a pistol, which he had been wearing on his person, shooting Simmons. Rodney testified that Simmons was on top of the Defendant and had him on the floor when the shot was fired. This initial gunshot wounded Simmons in the groin but, according to the doctor who performed the autopsy, was not lethal. Simmons fell to the floor, and Rodney and Angela ran for the door. Rodney was first to the door and made it outside. Angela was behind him, and the Defendant shot her once in the back, causing her to fall across the threshold of the door. The Defendant ran after Rodney, chasing him and firing shots at him. Rodney escaped after jumping over two fences.

Darla testified that after the Defendant shot Simmons the first time, Simmons told Darla to call 911, and she made the call from the bedroom. Darla subsequently returned to the living room, to which the Defendant had also returned after his pursuit of Rodney Martin. Darla testified that the Defendant was standing with the gun in his hand and Simmons was on the floor. Simmons had his hand up and, according to Darla, was begging the Defendant not to shoot him, telling the Defendant that he had a daughter. Darla testified that she told the Defendant not to shoot Simmons. The Defendant hugged Darla, told her he loved her, and told her he was going to the penitentiary. The Defendant also told her, "They made me do this." The phone then rang because the 911 dispatcher had called back, and Darla left the room to answer it. A tape recording of these phone calls between Darla and the 911 dispatcher was introduced at trial. The tape reveals that Darla was screaming incessantly while on the phone.

As the Defendant stood over Simmons, neighbor Tara Smith walked into the house to retrieve Roneisha, having been alerted to the situation by Lisa Martin. Tara testified that the scene sounded "hectic" and that she saw the Defendant in the living room with a gun in his hand. Tara testified that the Defendant stated to her that he was "going to the penitentiary." According to Tara, the Defendant appeared shaky and scared. Tara walked between the Defendant and Simmons and

heard Simmons say, "Don't shoot me." She then walked toward the screaming she could hear coming from another room and found Darla and the crying baby in the bedroom. Darla was on the phone. With Darla's permission, Tara took the baby and left the house. Simmons was still conscious when she left, but she did not hear him say anything else. Tara took Roneisha to her house and then began walking back across the street toward the Defendant's house when she heard more gunshots. Tara testified that she and the Defendant were friends, having grown up together. She stated that she had never seen the Defendant with a gun before and had never seen him attack anyone. She explained that the Defendant was "very protective" of Darla and Roneisha.

Lesley Carter, Tara Smith's sister, also testified. She and Tara lived across the street from the Defendant, and Lesley described herself as "good friends" with the Defendant. After Tara brought Roneisha home, Lesley crossed the street and entered the Defendant's house. She saw the Defendant standing in the living room and he told her, "I'm going to prison." The Defendant had a gun in his hand. Lesley testified that she saw Simmons lying on the floor and that he was "mumbling some things." According to Lesley, Simmons "all of a sudden . . . raised his head up and his arms up like that." She testified that it looked like Simmons was trying to get up. She also testified that she saw the Defendant shoot Simmons; the first two times he pulled the trigger, the gun merely clicked. The Defendant kept pulling the trigger, and Lesley saw two shots hit Simmons in the head. Lesley then ran from the house.

Lesley testified that she had never before seen the Defendant with a gun. She also testified that when the Defendant told her he was going to the penitentiary, "[h]e didn't sound all angry and he wasn't hysterical or nothing." On cross-examination, Lesley testified that she had known the Defendant most of his life and knew him to be quiet, kind and peaceful. She had never known him to assault anyone. She stated that the situation did not make sense. She testified that the Defendant had been yelling when she got to his home and acting totally out of character.

While Darla was on the phone the second time, she heard two more gunshots. Darla told the dispatcher about the shots, and the Defendant then walked into the room. The dispatcher asked to talk to the Defendant, and the Defendant began speaking with her. The Defendant subsequently left the house and turned himself over to the police, who had arrived on the scene. On patting the Defendant down, Officer Lee Freeman found several .357 magnum shell casings in his left front pocket.

Angela Martin and Edward Simmons had both been shot dead by the Defendant. Angela had been shot once; Simmons had been shot multiple times, twice in the head. Police officers collected eleven bullet casings from the scene, all of which had been fired from the Defendant's six-shot .357 revolver. The police also took custody of the Defendant's gun, and Officer Daniel Orr testified that the gun's first two chambers contained spent rounds; the third chamber contained a live round; the fourth chamber was empty; and the last two chambers contained spent rounds.

The Defendant gave a videotaped statement to the police after he was taken into custody and admitted shooting the victims. He further admitted that he chased and shot at Rodney Martin. The

Defendant explained that Rodney and Simmons had attacked him when he tried to pull Angela off of his sister. He pulled his gun and shot Simmons and shot Angela in the back as she tried to leave the house. He stated that he did not know Angela or Simmons, that Rodney was the only person he knew. He stated that he "had to protect us." He explained that he had armed himself "for protection" when he saw people he did not know coming to his house. He acknowledged that Simmons begged for his life and explained that he shot him anyway because Simmons would have done the same to him. He stated that he did not know whether Simmons was armed. He also stated that it was Simmons' fault that he shot him; that he shot Simmons because he was "so mad"; and that he was "so furious, [he] just lost [his] mind." He thought he remembered reloading the gun, but the videotaped statement is unintelligible about when and where this occurred.

Dr. Sam Craddock, a psychologist in the forensic services division at Middle Tennessee Mental Health Institute, testified that the Defendant spent 29 days at the hospital in the fall of 2000. Dr. Craddock testified that the Defendant was mildly mentally retarded; that he reported hearing voices; and that he was suffering from "schizophreniform disorder," the beginning stages of schizophrenia. Dr. Craddock explained that stressful situations were "[p]articularly" bad for persons suffering from schizophreniform disorder. Dr. Craddock also testified that the Defendant's mental state, particularly his retardation, caused him to have a "lack of ability to accurately assess the situation and respond in an appropriate fashion."

Defense counsel also attempted to introduce the testimony of Dr. Keith Caruso, a forensic psychiatrist. Defense counsel's reason for introducing Dr. Caruso's testimony was to support the defense theory that the Defendant killed the victims in self-defense or, at most, in response to adequate provocation.[1] On the State's objection regarding relevance, the trial court excluded Dr. Caruso's testimony, but the Defendant was allowed to develop Dr. Caruso's testimony outside the jury's presence. Dr. Caruso testified that he had diagnosed the Defendant as suffering from "mild mental retardation" and, further, that the Defendant had been suffering from differential schizophrenia with paranoia at baseline in December 1999. Dr. Caruso testified that mild retardation is a mental defect and that undifferentiated schizophrenia is a "severe mental disease." Dr. Caruso explained that a severe mental disease is "a condition that may impair someone to the degree that it . . . may prevent someone from forming the requisite mens rea for an offense." Dr. Caruso testified that mentally retarded individuals "are somewhat slower in terms of their capacity to process information" and that "it is difficult for them to process information quickly." Dr. Caruso explained that this "deficit[] . . . is particularly worse in a situation where there is a lot of stress and emotionality." Dr. Caruso also explained that, because of his paranoia, the Defendant "was more likely to feel threatened" and would "be prone to over interpret" an actual threat. Dr. Caruso testified that someone suffering from the Defendant's conditions "has a greater propensity to feel a degree of threat and it would take him longer to figure out that that threat either was not so great or had passed because of his deficits." Dr. Caruso opined that, seen through the filter of the Defendant's

---

[1] Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a).

deficits, "a reasonable person may have been driven to act irrationally, as [the Defendant] did." He further opined that the Defendant "did perceive that there was a great deal of threat to his family as a result of the way he saw the world, as a result of his deficits."

The Defendant was originally charged with first degree premeditated murder of Edward Simmons; first degree premeditated murder of Angela Martin; and attempted first degree premeditated murder of Rodney Martin. After the close of the State's proof, the trial court dismissed the counts alleging first degree premeditated murder and attempted first degree premeditated murder on the grounds that the State had failed to adduce proof of the Defendant's premeditation. The trial court subsequently instructed the jury on two counts of second degree murder and the lesser included offenses of voluntary manslaughter, reckless homicide, and criminally negligent homicide. As to Count Three, the trial court instructed the jury on attempted second degree murder and the lesser included offenses of attempted voluntary manslaughter, attempted reckless homicide, and attempted criminally negligent homicide.[2] The trial court further instructed the jury on the Defendant's plea of self-defense. The jury subsequently convicted the Defendant of the second degree murder of Edward Simmons, the voluntary manslaughter of Angela Martin, and the attempted voluntary manslaughter of Rodney Martin.

## EXCLUSION OF EXPERT TESTIMONY

We first address the Defendant's contention that the trial court committed reversible error by refusing to admit the expert testimony of Dr. Caruso. The Defendant contends that "a particular defendant's mental limitations are relevant to the[] critical issues" of self-defense and/or adequate provocation, and that the trial court abused its discretion in disallowing Dr. Caruso's testimony on these issues. The State disagrees.

At the outset, we note that this Court reviews a trial court's decisions with respect to the admissibility of evidence under an abuse of discretion standard. See State v. James, 81 S.W.3d 751, 760 (Tenn. 2002). An abuse of discretion appears where the trial court applied an incorrect legal standard, or where the trial court's ruling is against logic or reasoning and causes an injustice to the party complaining. See id.

Expert testimony is admissible when it "will substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Tenn. R. Evid. 702. Moreover, an expert witness' testimony "in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Tenn. R. Evid. 704. However, any expert testimony must be relevant in order to be admissible. See Tenn. R. Evid. 402. "Evidence which is not relevant is not admissible." Id. Relevant evidence is that evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

---

[2]We note that the offense of attempted criminally negligent homicide does not exist under Tennessee law. See State v. Nolan, 1997 Tenn. Crim. App. LEXIS 597, No. 01C01-9511-CC-00387 (Tenn. Crim. App., at Nashville, June 26, 1997), app. for perm. to appeal denied, (Tenn. March 2, 1998).

Resolution of the Defendant's issue therefore requires us to determine whether Dr. Caruso's testimony was relevant to either of two issues: whether the Defendant killed and attempted to kill the victims in self-defense and, if not, whether his killing of Simmons was voluntary manslaughter rather than second degree murder.

We first address whether Dr. Caruso's testimony was relevant to the Defendant's claim of self-defense. In support of his contention that it was, the Defendant relies on our supreme court's decision in State v. Shuck, 953 S.W.2d 662 (Tenn. 1997). In Shuck, the defendant was convicted of one count of solicitation to commit first degree murder and two counts of solicitation to commit especially aggravated kidnapping. See id. at 663. The defense theory was entrapment, and the defendant attempted to introduce expert psychological testimony about his susceptibility to inducement. The trial judge disallowed the proffered proof on the basis that it would invade the province of the jury. See id. at 665. Our supreme court held that the trial court thereby abused its discretion. See id. at 670. In the course of so holding, the supreme court noted that entrapment occurs "'when law enforcement officials, acting either directly or through an agent, induced or persuaded an otherwise unwilling person to commit an unlawful act when the person was not predisposed to do so.'" Id. at 666 (quoting Tenn. Code Ann. § 39-11-505). This defense, according to the court, "requires the jury to focus on the subjective intent of the defendant to determine inducement and predisposition." Id. (emphasis added). The court further noted that, under our Rules of Evidence, "the only ultimate issue about which an expert explicitly cannot offer an opinion is whether the defendant was or was not sane at the time of the commission of the criminal offense." Id. at 663 n.3. In Shuck, the defendant was attempting to offer expert proof about his susceptibility to inducement and persuasion; the trial court excluded this evidence on the basis that the proffered proof embraced an ultimate issue of fact to be decided by the jury. Thus, the supreme court found, the trial court applied an incorrect legal standard in excluding the evidence, and thereby abused its discretion. See id. at 669-70. Finding the error not harmless, the supreme court affirmed this Court's reversal of the defendant's convictions and remand of the matter for a new trial. See id. at 671.

The Defendant argues that, under Shuck, the trial court should have admitted the Defendant's proffered expert testimony about his mental retardation and mental illness for the purpose of proving his perception of the need for self-defense. We must note, however, a crucial distinction between the Defendant's theory in this case and the theory of defense in Shuck. As noted by the supreme court in Shuck, the defense of entrapment depends on a subjective test of the defendant's state of mind. However, the defense of self-defense depends primarily on an objective test: whether the defendant's belief that self-defense is necessary is reasonable. Our Criminal Code provides that

> [a] person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon

-6-

<u>reasonable</u> grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. § 39-11-611(a) (emphases added). As this Court has previously concluded, the defense of self-defense

> not only entail[s] what a defendant actually believes, but include[s], as well, what is a reasonable belief under the circumstances. This means that the defendant's conduct and mental state must meet an <u>objective standard of reasonableness</u> for the conduct to be justified under th[is] statutory defense[]. Thus, <u>the mere fact that the defendant believes that his conduct is justified would not suffice to justify his conduct</u>.

<u>State v. Bult</u>, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998) (emphases added).

There is only one component of the defense of self-defense that is particular to the defendant, that is, subjective in nature: whether the defendant "honestly believed" the danger to be real. While this element was not the sole determining factor in establishing the Defendant's theory of defense, Dr. Caruso's testimony was, nevertheless, relevant and helpful with respect to establishing this aspect of the Defendant's claim of self-defense. Accordingly, Dr. Caruso's testimony should have been admitted in support of the Defendant's plea of self-defense.

We turn now to whether Dr. Caruso's testimony was relevant to establishing that the Defendant's killing of Edward Simmons was voluntary manslaughter rather than second degree murder; that is, that he killed Simmons as the result of being "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Voluntary manslaughter has both a subjective and an objective element. The proof must establish that the defendant killed the victim while in a subjective state of passion. The proof must also establish that the defendant's subjective state of passion was produced by adequate provocation sufficient to lead a <u>reasonable</u> person to act in an irrational manner; that is, the provocation must be <u>objectively</u> adequate and sufficient to lead a reasonable person to commit an irrational (albeit intentional or knowing) killing. In this regard, Dr. Caruso's testimony was relevant and helpful with respect to establishing the Defendant's actual state of mind at the time he fired the gunshots that killed Simmons, and should therefore have been admitted.

Thus, we find that Dr. Caruso's testimony was relevant with respect to both the Defendant's claim of self-defense and his contention that his killing of Simmons was voluntary manslaughter rather than second degree murder. We further find that the trial court abused its discretion in concluding that Dr. Caruso's testimony was not relevant. We must now analyze whether the trial court's error entitles the Defendant to a new trial.

The erroneous exclusion of relevant evidence is subject to a harmless error analysis. <u>See</u> <u>Shuck</u>, 953 S.W.2d at 670. Therefore, we must determine "whether the trial court's failure to admit the testimony is an error which affirmatively appears to have affected the verdict." <u>Id.</u>; <u>see also</u>

Tenn. R. Crim. P. 52(a). We will first examine whether the trial court's error was harmless in the context of the Defendant's claim of self-defense.

Dr. Caruso's testimony was relevant to the Defendant's claim of self-defense only insofar as it could have assisted the jury in concluding that the Defendant "honestly believed" that he was at risk of imminent death or serious bodily injury at the times he shot and killed Angela Martin and Edward Simmons, and at the time he shot at Rodney Martin. However, we are convinced that the jury would have rejected the Defendant's claim of self-defense even if it had had the benefit of Dr. Caruso's testimony. With respect to Angela Martin, the Defendant shot her in the back as she was trying to run from the house. She was unarmed. In light of these uncontested facts, we believe the jury had sufficient grounds to find that the Defendant's conduct and mental state did not meet the necessary objective standard of reasonableness, even if the Defendant had honestly believed that he was at risk of imminent death or serious bodily injury at the time he shot and killed Angela Martin. Thus, we hold that the exclusion of Dr. Caruso's testimony does not affirmatively appear to have affected the jury's verdict with respect to its convicting the Defendant of the voluntary manslaughter of Angela Martin.

With respect to Edward Simmons, the Defendant shot him once and disabled him, causing Simmons to fall to the floor. The Defendant then ran out of the house and pursued Rodney Martin, shooting at him. The Defendant returned to his house and took a position over Simmons as Simmons begged for his life. Simmons tried to rise from the floor but was unable to regain his feet. The Defendant told the police that he did not know whether or not Simmons was armed; in other words, Simmons never threatened the Defendant with a gun. Darla told the Defendant not to shoot Simmons. Nevertheless, after Darla left the room to answer the phone, the Defendant shot Simmons twice in the head as he lay on the floor. The Defendant told the police that he shot Simmons because he was "so mad."

We first note that, unlike Angela and Rodney, Simmons did not enter the Defendant's house while Darla held the door open. Rather, the proof established that he entered the house sometime later, without invitation. Simmons was not a member of the Defendant's family or household. He entered the Defendant's house unlawfully and forcibly. Accordingly, the Defendant was entitled to a presumption that he held "a reasonable fear of imminent peril of death or serious bodily injury to self, family or a member of the household" when Simmons entered the Defendant's house. See Tenn. Code Ann. § 39-11-611(b). Indeed, the jury was instructed about this presumption. In light of this presumption with respect to Simmons, Dr. Caruso's testimony was actually cumulative for establishing the Defendant's honest belief at the time he shot and killed Simmons. Moreover, the circumstances surrounding the fatal shots to Simmons' head were sufficient to overcome the presumption and entitle the jury to conclude that the Defendant's mental state and conduct did not conform to an objective state of reasonableness. Thus, we hold that the exclusion of Dr. Caruso's testimony does not affirmatively appear to have affected the jury's verdict convicting the Defendant of the second degree murder of Edward Simmons.

Finally, at the time the Defendant shot at Rodney Martin, Rodney had left the Defendant's house and was running for his life. The Defendant nevertheless pursued him across the street, shooting at Rodney as he ran. Again, this proof entitled the jury to conclude that the Defendant's mental state and conduct did not conform to an objective state of reasonableness and convinces us that the jury's verdict convicting the Defendant of the attempted voluntary manslaughter of Rodney Martin would have been the same even with Dr. Caruso's testimony.

In sum, we find that the trial court's error in refusing to admit Dr. Caruso's testimony was harmless because the exclusion does not affirmatively appear to have affected the jury's verdicts insofar as those verdicts reflect a rejection of the Defendant's claim of self-defense. This issue is, therefore, without merit.

We turn now to the question of whether the trial court's error was harmless in the context of the jury's determination that the Defendant's killing of Simmons was second degree murder rather than voluntary manslaughter. Dr. Caruso's testimony could have helped to establish that the Defendant shot and killed Simmons while in a state of passion. However, in light of the circumstances under which the Defendant fired the fatal shots, we are convinced that, even with Dr. Caruso's testimony, the jury would have concluded that the Defendant's state of passion was not produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner. Indeed, Dr. Caruso himself testified that the provocation would have been sufficient only where the reasonable person was filtering the situation through the Defendant's particular mental deficits. However, that is not the test for voluntary manslaughter. A reasonable person would not feel adequately provoked to act in an irrational manner, by an unarmed man lying wounded and prostrate on the floor, begging for his life. Accordingly, we hold that the trial court's refusal to admit Dr. Caruso's testimony was harmless error, and this issue is therefore without merit

## SUFFICIENCY OF THE EVIDENCE

We now consider the Defendant's claim that the evidence is not sufficient to support his convictions. Specifically, the Defendant argues that the State did not carry its burden of proving beyond a reasonable doubt that the Defendant did not shoot at Simmons and the two Martins in self-defense. See Tenn. Code Ann. § 39-11-201(a)(3) ("No person may be convicted of an offense unless each of the following is proven beyond a reasonable doubt: . . . The negation of any defense to an offense . . . if admissible evidence is introduced supporting the defense[.]")

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102,

105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. See Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

The Defendant was convicted of committing the second degree murder of Edward Simmons. Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A defendant commits a knowing killing when the defendant was aware that the conduct which resulted in the death was reasonably certain to cause the death. See id. § 39-11-302(b). On the facts of this case, we have no doubt that the Defendant was aware that shooting his gun at Simmons' head from only a few feet away would result in Simmons' death. Indeed, the Defendant's own words -- that he was "going to prison" -- indicate that he was fully aware of the result of his shooting his pistol at Simmons' head. Moreover, the evidence adduced at trial was sufficient to negate the Defendant's claim that he shot Simmons in self-defense. As set forth above, the proof established that the Defendant did not fire the fatal shots until some minutes after he had shot and incapacitated Angela Martin and pursued Rodney Martin from his house and across the street. When the Defendant returned to his house, the only assailant remaining was Simmons, who was lying wounded on the floor, unarmed, and begging for his life. The Defendant initially abided by his sister's request not to shoot Simmons. However, after she left the room, the Defendant shot Simmons twice in the head. He later told the police that he shot Simmons because he was "so mad."

We appreciate the Defendant's points that the episode involved a home invasion; that there was a great deal of noise and screaming and chaos; and that witnesses testified that the Defendant appeared nervous and scared and that he was acting out of character. Nevertheless, the final determination of whether the Defendant shot Simmons in self-defense was up to the jury, see State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997), and the State adduced sufficient proof for the jury to properly reject the Defendant's claim of self-defense. Accordingly, the Defendant's contention regarding the sufficiency of the evidence in support of his conviction of second degree murder is without merit.

We turn now to the Defendant's conviction of the voluntary manslaughter of Angela Martin. Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). The proof is more than sufficient to establish

that the Defendant committed the voluntary manslaughter of Angela Martin. Moreover, we hold that the State adduced sufficient proof for the jury to reject the Defendant's claim of self-defense with respect to his killing of Angela Martin. After the Defendant initially fired his gun, wounding Simmons, Angela turned and fled toward the door, trying to get outside. The Defendant shot her in the back, and she fell across the threshold of the door. The Defendant shot Angela after Simmons was already on the floor and after Rodney Martin had already fled the premises. The jury had sufficient evidence upon which to reject the Defendant's claim that he shot and killed Angela Martin in self-defense, and this issue is therefore without merit.

Finally, we consider the sufficiency of the evidence in support of the Defendant's conviction of the attempted voluntary manslaughter of Rodney Martin. The proof in support of this conviction established that the Defendant pursued Rodney after Rodney left the Defendant's house and fired several shots at Rodney before abandoning the chase. This proof is sufficient to support the conviction, and is furthermore sufficient to negate the Defendant's claim that he shot at Rodney's fleeing back in self-defense. This issue is, accordingly, without merit.

### SENTENCING

The trial court sentenced the Defendant as a Range I offender. The Range I sentence for second degree murder is fifteen to twenty-five years. See Tenn. Code Ann. § 39-13-210(b), 40-35-112(a)(1). Because second degree murder is a Class A felony, see id. § 39-13-210(b), the presumptive sentence is the midpoint of the range, or twenty years. See id. § 40-35-210(c). The presumptive sentence is increased by applicable enhancement factors and decreased by applicable mitigating factors. See id. § 40-35-210(e)(Supp. 2002). In this case, the trial court sentenced the Defendant to twenty-two years for the second degree murder of Edward Simmons, finding no mitigating factors and two enhancement factors: that the victim of the offense was particularly vulnerable because of physical disability,[3] and the Defendant employed a firearm during the commission of the offense. See id. § 40-35-114(5), (10) (Supp. 2002).

Voluntary manslaughter is a Class C felony, see id. § 39-13-211(b), and the Range I sentence for that offense is three to six years. See id. § 40-35-112(a)(3). The presumptive sentence for a Class C felony is the minimum in the range. See id. § 40-35-210(c). Making no reference to enhancement or mitigating factors, the trial court sentenced the Defendant to the minimum three-year term for the voluntary manslaughter of Angela Martin.

Attempted voluntary manslaughter is a Class D felony, see id. § 39-12-107(a), and the Range I sentence for that offense is two to four years. See id. § 40-35-112(a)(4). The presumptive sentence for a Class D felony is the minimum in the range. See id. § 40-35-210(c). Making no reference to enhancement or mitigating factors, the trial court sentenced the Defendant to the minimum two-year term for the attempted voluntary manslaughter of Rodney Martin.

---

[3]The trial court based this finding on the fact that Simmons had been shot and disabled prior to the Defendant firing the lethal shots.

The Defendant contends on appeal that, in imposing sentence for the second degree murder conviction, the trial court erred by refusing to apply numerous mitigating factors. Specifically, the defendant argues that the trial court should have reduced his sentence on the bases that:

(a) he acted under strong provocation;

(b) substantial grounds existed tending to excuse or justify his criminal conduct, though failing to establish a defense;

(c) because of youth or old age, he lacked substantial judgment in committing the offense;[4]

(d) he was suffering from a mental or physical condition that significantly reduced his culpability for the offense; [and]

(e) although guilty of the crime, he committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his criminal conduct.

See id. § 40-35-113(2), (3), (6), (8), (11). The State argues that the Defendant is entitled to no relief on this issue.

When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

When conducting a de novo review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Brewer, 875 S.W.2d 298, 302 (Tenn. Crim. App. 1993); State v. Thomas, 755 S.W.2d 838, 844 (Tenn. Crim. App. 1988).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are

---

[4]The Defendant argues that, because of his retardation, his effective age is "adolescent."

-12-

adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. See State v. Pike, 978 S.W.2d 904, 926-27 (Tenn. 1998); State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

We agree with the Defendant that the circumstances surrounding his murder of Simmons and the Defendant's particular mental deficits support the application of all of these mitigating factors. The Defendant shot and killed Simmons in response to a late night home invasion in which he and his sister were attacked. The Defendant perceived the situation as requiring that he protect himself, his sister and his niece. These circumstances support application of the factors for strong provocation, substantial grounds tending to excuse or justify the Defendant's conduct, and such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the murder. Moreover, the proof established that the Defendant's mental deficits rendered him unable to process information quickly, and more prone to perceive and overreact to threats. Unlike a claim of self-defense, the mitigating factors relied upon by the Defendant do not depend upon an objective "reasonable person" test for their applicability. The Defendant's mental deficits reduced his culpability for killing Simmons and rendered him sufficiently lacking in mental maturity to support a finding that he lacked substantial judgment in committing the offense.

The trial court offered no explanation for its outright rejection of these mitigation factors. Yet, the evidence is more than sufficient to support their application. Therefore, we find that the trial court erred in failing to reduce the Defendant's sentence on the basis of these mitigating factors.

Where there are both enhancement and mitigating factors, "the court must start at the [presumptive] sentence in the range, enhance the sentence within the range as appropriate for the enhancement factors, then reduce the sentence within the range as appropriate for the mitigating factors." Tenn. Code Ann. § 40-35-210(e). Here, the trial court increased the Defendant's sentence by two years based on two enhancement factors. We must now determine the amount of time by which the Defendant's sentence should be reduced based upon the applicable mitigating factors. We note at the outset that all five mitigating factors depend on two basic sets of circumstances: the manner in which the victims placed themselves in harm's way, and the Defendant's particular mental conditions. Thus, we deem it appropriate to "blend" the various mitigating factors insofar as they relate to either of these sets of circumstances. See, e.g., State v. Matthew C. Welker, No. 01C01-9610-CC-00456, 1998 Tenn. Crim. App. LEXIS 419, at *26-27 (Nashville, April 1, 1998) (finding no error in the trial court's combination of several applicable mitigating factors under the single mitigation factor of strong provocation where each of the factors focused "mainly on a single notion" of the defendant's culpability as affected by his childhood physical and sexual abuse). Accordingly, for the purpose of weighing the applicable enhancement and mitigating factors, we hold that the enhancement factors applied by the trial court are balanced by the mitigating factors. The trial court increased the Defendant's presumptive sentence by two years based on the enhancement factors; we now reduce the Defendant's sentence by two years based on the mitigating factors. Accordingly, we modify the Defendant's sentence for the second degree murder of Edward Simmons to a term of twenty years.

-13-

The Defendant also contends that the trial court erred by ordering the two-year attempted voluntary manslaughter sentence to run consecutively to the second degree murder and voluntary manslaughter sentences. The trial court ordered consecutive sentences on finding the Defendant to be a "dangerous offender." See Tenn. Code Ann. § 40-35-115(b)(4) (allowing for the imposition of consecutive sentences where the court finds by a preponderance of the evidence that the defendant "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high"). The Defendant argues that the proof does not support this finding.

> The trial court's entire statement with respect to this issue is as follows:
> taking into consideration [the Defendant's] past, taking into consideration the lapse of time that occurred between the first shots and the second shots, this Court finds that . . . [the Defendant] is a dangerous offender.

Significantly, the trial court did not make the additional findings required under State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995): that the length of the consecutive sentences reasonably relate to the severity of the offenses committed, and an extended sentence is necessary to protect the public against further criminal conduct by the Defendant.

We first note that the "past" referred to by the trial court consisted of several altercations in which the Defendant had been involved some time prior to the instant incident, none of which resulted in any criminal proceedings.[5] All of the proof of these altercations consisted of hearsay; none of the alleged victims testified. None of these incidents involved a gun, and the proof indicated that the Defendant did not begin these fights. As we have previously noted several times, the instant crimes involved a home invasion and circumstances which led the jury to convict the Defendant of only voluntary manslaughter with respect to one of the victims. We conclude that the State failed to put on sufficient proof for the trial court to find that consecutive sentences were necessary in order to protect the public from further criminal acts by the Defendant. Cf. Wilkerson, 905 S.W.2d at 938. Indeed, the trial court did not make that finding.

Accordingly, we conclude that the trial court erred when it ordered the Defendant's sentence for attempted voluntary manslaughter to run consecutively to the Defendant's sentences for second degree murder and voluntary manslaughter. We modify the Defendant's sentences such that all three sentences are ordered to run concurrently with each other. This case is remanded solely for the purpose of entering new sentencing orders consistent herewith.

The Defendant's sentence for second degree murder is modified to twenty years. All three sentences are to be served concurrently. The judgment of the trial court is, in all other respects, affirmed.

---

[5]The Defendant had also been involved in a fight while in jail.

_____
DAVID H. WELLES, JUDGE