# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 21, 2012

## STATE OF TENNESSEE v. RONALDO REGALA PUNO, JR.

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-C-2276      Mark J. Fishburn, Judge**

---

**No. M2011-00400-CCA-R3-CD - Filed November 14, 2012**

---

A Davidson County Criminal Court Jury convicted the appellant, Ronaldo Regala Puno, Jr., of attempted first degree murder and aggravated assault. The trial court merged the convictions and sentenced the appellant to seventeen years in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence supporting his conviction for attempted first degree murder. Upon review, we conclude that the evidence is sufficient to sustain the appellant's conviction, but we remand the case to the trial court for entry of a single judgment reflecting the merger of the convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are
Affirmed; Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Michael A. Colavecchio, Nashville, Tennessee, for appellant, Ronaldo Regala Puno, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith DeVault, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Sarah Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

At trial, Sonja Elaine Perry testified that in March 2008, she was living with her parents at 304 Alta Loma Road. Around 2:15 or 2:30 a.m. on March 12, Perry was getting ready to go to work when she heard screaming outside. Initially, Perry thought the screaming

might be children at a nearby skating rink. However, the screaming continued, and she thought it sounded like a woman. She said that the screams were loud and lasted about fifteen minutes. At Perry's behest, her father called 911. Less than five minutes later, the police arrived and talked with Perry's father. Perry watched as police looked around outside and eventually located two people in a ditch at the bottom of the sloping front yard.

The victim, Omarya Luz Pacheco, testified that in March 2008, she was eighteen years old. She said that she had a hernia in her left lung and that she had asthma, making it difficult for her to breathe when she overexerted herself. She stated that most people knew about her condition.

The victim said that she attended tenth and eleventh grades at Northwest High School in Clarksville, Tennessee, where she met and started dating the appellant. She moved to Florida for her twelfth grade year but continued dating the appellant. After graduating from high school, she returned to Tennessee, lived with her sister, and attended the Art Institute in Goodlettsville. She continued dating the appellant, who was attending Nossi Art College and living with his best friend "Jay-Jay" in the Alta Loma Apartments.

The victim said that around October or November 2007, the appellant became jealous and controlling. The relationship ended around early December 2007. From December to March 2008, they did not communicate with each other except for an occasional text message.

On March 11, 2008, the victim attempted to call the appellant to retrieve her laptop computer from his apartment. After her attempts were unsuccessful, she talked to the appellant's mother in Clarksville and asked for help contacting the appellant. She also went to the appellant's Alta Loma apartment and spoke with "Jay-Jay," who told her that the appellant would be home later that night or the next day. The victim went home, and around midnight the appellant, who had been contacted by his mother, called and told her to come to the apartment to get her computer. Because her sister was asleep, the victim went to the apartment alone.

When she arrived, the appellant was standing on the concrete patio in front of the apartment door. He had a jacket folded over his arms, which the victim thought was strange because it was cold outside. The victim's laptop was on the patio. The victim said:

> [W]hen I walked up to him the first time, he told me that I was
> leaving, that it was the last time I was going to see [him], that I
> was going, and I asked him where I was going, and he just kept
> saying, "You're just leaving," and he started crying.

She did not know what the appellant meant.

The victim asked the appellant why he was not inside the apartment. He responded that he did not live there anymore and that he was no longer attending school. He insinuated that he did not have anywhere to live and that he was living on the street. The victim did not think the appellant looked homeless, noting that he was not dirty or "unshaven." The victim told the appellant that she would tell "Jay-Jay" that the appellant had been at the apartment and would inform the appellant's mother that he was not going to school. When she reached for the front door of the apartment, the appellant grabbed her arms, pulled them behind her back, and ordered her to not tell anyone. The victim tried to get away, but the appellant held fast. The victim started to cry and asked him to stop, promising to not say anything to anyone. The appellant then released her and walked out of her sight.

The victim said that the appellant left the apartment complex and walked in the direction of Home Depot. He was crying. The victim was concerned about the appellant, so she followed him in her car. The victim coaxed the appellant to the car window, hoping that she could convince him to let her drive him home. She noticed a black handle protruding from the jacket folded over his arms. The victim heard something drop and asked the appellant what it was. The appellant ignored her, picked up the item, and began walking in the opposite direction.

The victim turned her car around and continued to follow the appellant because she was concerned about his safety. She stopped the vehicle beside the appellant, and he asked her for a hug. The victim got out of the car and hugged him. She returned to the car, parked in a driveway to get out of the road, and again tried to coax him into the vehicle. The appellant asked for another hug, and the victim complied.

When the victim got back in the car, the appellant requested a third hug. The victim found his repeated requests for a hug to be strange. Before she exited the car, she noticed the appellant was holding something under his jacket, and she told him to put it on the ground. When she got out of the car, she saw that he was holding "some type of stick thing on his left side." The victim started backing away and asked the appellant what he was holding. The appellant replied that it was nothing and that he was not going to hurt her. At the victim's request, the appellant put the object on the ground.

The victim said that she began crying, told the appellant that she was scared, and asked him to stay away. The appellant got mad, turned around, picked up the object he had dropped, approached the victim, and hit the side of her face with the object. Because it was dark outside, the victim could not determine what the object was, only that it was long. When the victim pulled her cellular telephone from her pocket to call 911, the appellant hit her on

the back of her head and on her back, causing her to drop the telephone. The victim said that she screamed each time the appellant struck her. She described the blows as "very hard, like forceful."

The victim said that when the appellant struck her, she ran from him, tumbled down a hill, and fell into a bush. The appellant followed, climbed on top of her, and shoved his fingers down her throat. The appellant also choked her, causing her to be unable to breathe. She asked the appellant to stop and told him that she did not want to die. He did not respond. The victim said the appellant was aware that she had asthma and a lung condition.

The victim said that when the appellant realized the police had arrived, he told her to be quiet. He also told her that he loved her and did not mean to hurt her. The appellant told the victim that he would tell the police that someone had attacked her and that he had protected her. He instructed her to support his story. The police arrived, and the victim did not contradict the appellant as he relayed his story. She explained that she was lying on the ground and did not want to say anything while the appellant was nearby. The victim was hurt and bleeding and had blood covering her hair and face. After the appellant was placed in one ambulance and the victim was placed in another, she revealed that the appellant had assaulted her.

The victim said the appellant hit her face, back, and the back of her head ten or fifteen times. She thought the appellant was going to kill her. She estimated that one and a half to two hours elapsed between the time she first arrived at the apartment and the time the appellant attacked her. The victim said that she had three lacerations on her head, a swollen nose and lip, a "really big dent in the middle of [her] scalp," and bruises on her back and arms. She said that at the hospital, she received around thirteen stitches "underneath and on top" of her upper lip. She also received approximately twenty stitches on her forehead and numerous staples on the lacerations on her head. She stated that she has a scar on her forehead and hairline and a scar on her lip. She said that she was in the hospital for about four to five hours and that she was in pain until she was given medication.

On cross-examination, the victim acknowledged that she followed the appellant even though he told her to leave. She said that she fell into the ditch and that the appellant did not push her. She conceded that the appellant never threatened to kill her. She said that the choking lasted less than a minute and that the appellant used only one hand to choke her. She acknowledged that the appellant calmed down, that he told her he loved her, and that he did not mean to hurt her shortly before the police arrived. She said that the police pulled the appellant off of her.

On redirect examination, the victim said that the appellant was on top of her when the police arrived. She said the appellant was not hurting her at the time, but he did not want the police to see them and told her to be quiet.

Dr. Jeffrey Paul McKenzie testified that he treated the victim when she came into the emergency room in the early morning hours of March 12, 2008. He stated that the victim had been assaulted by another person and that he later learned that a sword was used in the assault. Dr. McKenzie stated that the victim was "amnestic," meaning that she had some loss of memory regarding the events. The doctor stated that her "shock-like state" was to be expected after the stress of the events.

Dr. McKenzie said that the victim had multiple lacerations to her face and scalp. He explained that her scalp wounds were closed with staples. To promote a better cosmetic result, the lacerations to her face were stitched closed. He noted that the laceration to her upper lip just below her nose was "deep . . . enough that [it] required not only stitches to the skin but also some deep stitches as well." Dr. McKenzie recalled that the victim "had a fracture of her maxillary spine, which is a portion of that bone between the nose and the upper teeth, so right in the midline, right straight back underneath her upper lip." He said the wound was a result of multiple blows delivered with a significant amount of force.

Goodlettsville Police Department Officer Kerry Burdin testified that around 3:00 a.m. on March 12, 2008, he and Officer Jeff Pennington responded to a complaint of screams in the area between 300 and 306 Alta Loma Road. Upon arrival, they surveyed the scene but did not see anything. Officer Pennington contacted the complainant, and Officer Burdin got in his car to leave.

As Officer Burdin drove east on Alta Loma Road, he saw a car parked at the top of a downhill-sloping driveway at 300 Alta Loma Road. The car's door was open, the lights were on, and the car was running. The car was unoccupied, and no one was nearby. He checked the car's license plate number and learned that the car was not registered to anyone who lived at 300 Alta Loma Road. He scanned the area with a flashlight and saw a bush at the bottom of a steep hill. He thought he saw a wet animal with dark hair in front of the bush; however, when he got closer he saw the appellant "hovering" over the victim. They were shaking because it was cold outside.

Officer Burdin called for Officer Pennington then asked the victim and the appellant what had happened. The appellant said, "[S]ome guy jumped us," and he pointed toward the street. Officer Burdin asked if it was a carjacking, and the appellant said yes. Officer Burdin thought the claim was strange, noting that neither the car nor the purse and laptop computer in the car had been taken. The appellant said that the perpetrator hit him with "a metal pole."

He described the perpetrator as a black male wearing dark clothing who ran toward the railroad trestle. Officer Burdin thought the appellant resembled the description of the alleged perpetrator.

Officer Burdin said that the appellant did most of the talking and that the victim was kneeling on the ground, shivering and crying. Officer Burdin stayed with the appellant and the victim until paramedics arrived. The appellant and the victim were taken to separate ambulances. The paramedics told Officer Burdin that the appellant's only injury was a cut to one finger "that looked like the meat was just almost ripped off."

Officer Burdin and Officer Pennington determined that most of the blood on the appellant came from the victim's wounds. Approximately twenty minutes after arriving, the ambulance left to transport the victim to the hospital. Thereafter, Officer Burdin learned that the victim had said the appellant assaulted her. Officer Burdin believed the victim's allegations matched the physical evidence from the scene.

The appellant was removed from the ambulance after paramedics determined he was not seriously injured. Officer Burdin took the appellant into custody and placed him in the back of the patrol car. The appellant complained of being cold and asked Officer Burdin to retrieve his jacket from the ground. When Officer Burdin picked up the jacket, a sword in a black sheath fell from it.

Detective Les Carlisle helped search the scene for evidence. He found "blood-soaked grass" and the victim's bloody cellular telephone at the top of the hill. Officer Burdin found a broken handle wrapped with ribbon and discovered various pieces of plastic and metal. Detective Carlisle said that if the handle and pieces were assembled, they would look "fairly identical" to the intact sword found in the appellant's jacket. He also noticed blood on the appellant's shirt, shoes, and hands.

Based upon the foregoing, the jury found the appellant guilty of attempted first degree murder and aggravated assault. The trial court merged the aggravated assault conviction into the attempted first degree murder conviction and imposed a sentence of seventeen years. On appeal, the appellant challenges the sufficiency of the evidence supporting his conviction for attempted first degree murder. Specifically, the appellant contends there was no proof of premeditation, that there was no proof that he intended to kill the victim, and that the offense was, at most, an assault.

## II. Analysis

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

First degree premeditated murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a

motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

In the instant case, the appellant agreed to meet with the unarmed victim, and he brought two swords with him to the meeting. As they spoke, the appellant became angry and acted erratically. When the victim attempted to call 911, the appellant struck her on the back of her head. The appellant repeatedly hit the victim with a sword approximately ten to fifteen times in the face, head, and back with enough force to break the sword into pieces. The victim suffered several lacerations, bruises, swelling, and a broken bone in her face. After the beating, the appellant shoved his fingers down the victim's throat and choked her, even though he was aware the victim had a congenital lung defect that made breathing difficult. The appellant did not stop beating the victim until he heard the police. The victim testified that she thought she was going to die. The appellant told the police a story implicating a fabricated perpetrator and ordered the victim to agree with his version of events. The entire incident lasted two or two and a half hours from the initial encounter until the police arrived. We conclude that the jury could have found from the foregoing that the appellant was guilty of attempted first degree murder.

We note that the trial court entered separate judgments for the appellant's convictions for attempted first degree murder and for aggravated assault, indicating a merger of the convictions on the latter judgment. However, the court should have entered only one judgment of conviction, noting the merger of the counts. See State v. Howard, 30 S.W.3d 271, 274 n.4 (Tenn. 2000); State v. William F. Cartwright, No. M2003-00483-CCA-R3-CD, 2004 WL 1056064, at *6 (Tenn. Crim. App. at Nashville, May 10, 2004). Therefore, we must remand the case for entry of a single judgment of conviction.

### III. Conclusion

In sum, we conclude that there was sufficient evidence to sustain the appellant's attempted first degree murder conviction. However, the case is remanded to the trial court for entry of a single judgment reflecting the merger of the convictions.

_____
NORMA MCGEE OGLE, JUDGE